UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

GERARDO HERNANDEZ,

             Plaintiff,

    v.

ROBERTS OF WOODSIDE, et al.,

             Defendants.

Case No.  19-cv-07911-TSH

**ORDER RE: MOTION FOR
SUMMARY JUDGMENT**

Re: Dkt. No. 40

## I.    INTRODUCTION

Pending before the Court is Plaintiff Gerardo Hernandez's ("Plaintiff's") Motion for
Summary Judgment, or in the alternative, Summary Adjudication against Defendants Roberts of
Woodside and George Roberts Market Property LLC (collectively "Defendants").  ECF No. 40.
Defendants filed an Opposition (ECF No. 45) and Plaintiff filed a Reply.  ECF No. 46.  Having
considered the parties' positions, relevant legal authority, and the record in this case, the Court
**GRANTS IN PART** and **DENIES IN PART** Plaintiff's motion for the following reasons.[1]

## II.    BACKGROUND

**A.    Factual Background**

    **1.    Plaintiff, Defendants, Facility**

Plaintiff cannot walk and has relied on a wheelchair for mobility since he was paralyzed in
2007.  Declaration of Gerardo Hernandez ("Hernandez Decl.") ¶¶ 2-5 (ECF No. 42), Exh. A
(Plaintiff's receipt for wheelchair) (ECF No. 42-1) and Exh. B (DMV Disability Parking Placard)

---

[1] The parties have consented to magistrate judge jurisdiction pursuant to 28 U.S.C. § 636(c).  ECF
No. 19 ¶ 13.

United States District Court
Northern District of California

United States District Court
Northern District of California

(ECF No. 42-2); Moore Decl. Exh. A, Deposition Transcript of Gerardo Hernandez ("Hernandez Depo.") at 9:3-17.  ECF No. 41-1.

George Roberts became the owner of Roberts Market in 1960.  Declaration of Tanya E. Moore ("Moore Decl.") Exh. C, Transcript of Deposition of Christine Roberts ("Roberts") as an Individual ("Roberts Indiv. Depo.") at 12:2-4.  ECF No. 41-3.  Roberts Market, located at 3015 Woodside Road, Woodside, California ("the Store"), employs between fifty and one hundred workers and additional employees at another location in Portola Valley.  Roberts Indiv. Depo. at 14:2-21.  For the purpose of this motion, the parties agree that the Store is an existing facility, that is, it was built before January 26, 1993.  *See* Mot. p. 5.

The Store is located a short distance from Plaintiff's house, near Woodside High School where his son's football games are often held.  Hernandez Depo. at 13:14-18, 20:15-20.  Plaintiff remembers going to the Store when he was in high school, prior to his disability, and likes the food sold there.  Hernandez Decl. ¶ 17; Hernandez Depo. at 12:24-13:7.

### 2.    Plaintiff's September 14, 2019 Visit To The Store

On September 14, 2019, Plaintiff went to the Store to purchase sandwiches to eat during his son's nearby football game.  Hernandez Decl., ¶¶ 8, 42, Exh. C (September 14, 2019, 8:30 a.m. receipt from Roberts Market) (ECF No. 42-3), Exh. D (screenshot of September 14, 2019 football schedule at Woodside High School) (ECF No. 42-4); Hernandez Depo. at 19:17-19; Verified First Amended Complaint ("FAC") ¶ 10.[2]  ECF No. 26.  Defendants dispute that Plaintiff went to the Store on that date.  *See, e.g.,* Defendants' Controverting Statement of Facts ("Defendants' CSF") Response Nos. 5-11.  ECF No. 45-3.

#### a.    Path Of Travel To Store Entrance

Plaintiff states in his declaration that when he arrived at the Store on September 14, 2019,

---

[2]  The Court may consider Plaintiff's verified complaint on summary judgment because it is based on personal knowledge and sets forth specific facts admissible in evidence.  FAC p. 13; *see McElyea v. Babbitt*, 833 F.2d 196, 197-98 and n.1 (9th Cir. 1987) (citing *In Lew v. Kona Hospital*, 754 F.2d 1420, 1423 (9th Cir. 1985) (holding that "[a] verified complaint may be treated as an affidavit to the extent that the complaint is based on personal knowledge and sets forth facts admissible in evidence . . . ").

he "parked in the only designated accessible parking stall, located in the parking lot on the west side of the building." Hernandez Decl. ¶ 10. He states that the "pavement between the designated accessible parking stall and the walkway leading to the Store entrance was deteriorated, cracked, and sloped, and it was difficult and uncomfortable for [him] to wheel over the pavement." *Id.* Using his manual wheelchair (*id.* ¶ 9), he "had to maneuver around the loose asphalt and over a particularly large crack, which was difficult and required a lot of strength" (*id.* ¶ 10), which "caused discomfort in [his] back, arms, and in [his] fingers due to gripping the wheelchair wheels. Cracks are difficult for [him] to wheel over in [his] manual wheelchair, because [he had] to do a 'wheelie' to get over them." *Id.*; *see also* FAC ¶ 10(a); Hernandez Depo. at 40:5-16; 41:1-4; 42:10-43:13. Plaintiff "did not see any employees outside that could have assisted [him], nor did there appear to be any way for [him] to summon them such as a buzzer or intercom" (Hernandez Decl. ¶ 11), nor did he "see any signs telling [him] how [he] could get service if [he] could not get into the Store." *Id.*

Defendants dispute Plaintiff's testimony, claiming that because he successfully entered the store, he did so "without excessive strain, difficulty or injury, and did not require anyone's assistance." Opp'n. p. 7, citing Paetkau Decl. Exh. 4, Hernandez Depo. at 25:9-27:2. They conclude this means that the path of travel does not present an access barrier. *See* Defendants' CSF Response Nos. 13, 14.

The parties conducted a joint site inspection of the Store on February 27, 2020, which was attended by both Plaintiff's retained expert, Michael J. Bluhm ("Bluhm") (Bluhm Declaration ("Bluhm Decl.") ¶ 3, ECF No. 43) and Defendants' retained expert, Thomas E. Anderson. Declaration of Tyler E. Paetkau ("Paetkau Decl.") Exh. 1, Transcript of Thomas E. Anderson ("Anderson") Deposition Testimony ("Anderson Depo.") at 165:10-13. Bluhm has submitted a detailed declaration laying out his credentials as an ADA accessibility expert, as well as a copy of his resume. *See* Bluhm Decl. ¶¶ 4-10 and Exh. A. Anderson has submitted no declaration, affidavit, or report concerning his findings nor any indication of his credentials as an expert to this Court, although sections of his deposition in which he describes what he saw at the Store are excerpted and cited in relation to this Motion.

United States District Court
Northern District of California

1    Bluhm describes his findings in his Declaration and attaches photographs thereto that

2    include rulers indicating measurements and level tools indicating degrees of surface slopes.  In his

3    declaration, Bluhm testifies that the path of travel from the designated accessible parking stall to

4    the Store entrance "contained slopes up to 6.6% in the direction of travel, cross slopes up to 4.9%,

5    and vertical height changes over 1/4 inch in height, and gaps in the walking surface that would

6    allow the passage of a half-inch-diameter sphere."  Bluhm Decl. ¶ 13.  Bluhm attached to his

7    declaration photographs he personally took on February 27, 2020 documenting these conditions

8    and his measurements of them.  *Id.*, Exh. C.  ECF No. 43-3.  He also measured the path of travel

9    from the "perceived public pedestrian walkway" parallel to the Store's parking lot to the nearest

10   Store entrance – which adjoins the access aisle serving the Store's designated accessible parking

11   stall and merges with the Store's entry/exit walkway – and observed that it "contained slopes in

12   the direction of travel and cross slopes up to 13.6%, vertical height changes over 1/4 inch in height

13   including one that was approximately one full inch in height, and gaps in the walking surface that

14   would allow the passage of a half-inch-diameter sphere."  Bluhm Decl. ¶ 11.  Again, photographs

15   attached to the declaration support Bluhm's testimony.  Bluhm Decl. Exh. B.  ECF No. 43-2.  He

16   further observed that the walkway serving the Store entrances contained cross slopes in excess of

17   2.08% in many locations, including measurements up to 3.4%, and provided photographs

18   supporting these findings.  Bluhm Decl. ¶ 15 and Exh. D.

19   Plaintiff also hired a private investigator, Robert Ferris, who submitted a declaration

20   concerning his experience at the Store while using a manual wheelchair.  ECF No. 47, Declaration

21   of Robert Ferris ISO Plaintiff's motion ("Ferris Decl.") ¶ 1.  Ferris is familiar with the use of a

22   manual wheelchair because he spent about two months confined to a wheelchair post-operatively.

23   *Id.* ¶ 7.  He stated that during each of three visits to the Store on November 4, 14, and 16, 2020 (*id.*

24   ¶ 4), "it was difficult for [him] to wheel over the uneven pavement" on the route from the

25   designated accessible parking to the Store entrance.  *Id.* ¶ 8.

26   Anderson admits that he "did not do independent readings," did not use a level to

27   determine the slope in the path of travel from the Store's designated accessible parking spot to the

28   entrance, and took none of his own measurements.  Anderson Depo. at 94:6-10.  He testified that

4

United States District Court
Northern District of California

he did not disagree with the measurements provided by Bluhm in his report, saying "what he measured was what he found" (*id.* at 94:13-20), and that he did not find any measurements that were incorrect. *Id.* at 94:22-25. Defendants do not dispute Bluhm's findings in response to Plaintiff's Separate Statement of Undisputed Facts ("SSUF") but argue that they are "immaterial, as the ADAAG standards did not apply to Roberts Market" and that "Plaintiff did not encounter any barrier to access to the store." Defendants' CSF Response Nos. 33, 36.[3]

Defendants cite Anderson's deposition testimony in which he stated that "the pavement between the accessibility [sic] parking stall and the entrance to the store contained no cracks or vertical changes that would prevent access to the store by a wheelchair user, that there were no cracks or vertical changes in the pavement that a wheelchair could not easily roll over, and that what Plaintiff characterizes as 'large cracks,' were, in fact normal wear and tear." Opp'n. p. 7, citing Anderson Depo. at 90:16-94:12. Anderson denied that any of Bluhm's findings constituted an access barrier for the Store as an existing building. *See* Anderson Depo. at 90:16-94:12.

Specifically, Anderson testified that: he encountered an "unobstructed path of travel on [his] walking route from the parking lot to the entry doors" (*id.* at 90:16-91:4); loose asphalt is not a barrier within the path of travel (*id.* at 91:14-16); running slope in excess of 5% is not a barrier in an existing facility (*id.* at 91:17-22); cross slope in excess of 2% is not a barrier within any path of travel (*id.* at 91:23-25) and later clarified that cross slope in excess of 2% within any path of travel "might be a barrier, but there's no work required on an existing facility" (*id.* at 94:2-5); cracked asphalt may be a barrier but "there's no work required on this particular property" (*id.* at 92:1-11, 16-20); he saw "nothing that prevented [him] or anyone else from traversing that path" (*id.* at 92:11-13); he was "not aware of any regulations that provide what size cannot be exceeded by a crack" at existing facilities (*id.* at 92:21-23). When he was asked whether he "observe[d] any vertical changes in level or displacement" within the path of travel from the parking to entrance of

---

[3] Defendants repeat these arguments multiple times. They assert that "the ADAAG standards did not apply to Roberts Market" over twenty times in response to facts in Plaintiff's SSUF and their expert repeats it many times throughout his deposition. This argument is addressed *infra*. Similarly, they assert that "Plaintiff did not encounter any barrier to access to the store" in response to over forty of Plaintiff's entries in his SSUF. This argument is addressed *infra*.

1

the market, he answered, "No.  Nothing that would prevent access."  *Id.* at 119:8-12.  He went so

2

far as to opine that "if it was like, a barrier, like Half Dome, there's still no work required because

3

there's been no new work done."  Supp. Moore Decl. ¶ 7, Exh. D, Anderson Depo. at 144:1-12.

4

Anderson admitted, however, that he did not use a level to determine the slope in the path

5

of travel from the Store's designated accessible parking spot to the entrance.  *Id.* at 94:6-9.

6

Despite not performing his own measurements, when he was asked about his statement that the

7

path of travel "was not encumbered by architectural barriers, did you consider any change in level

8

or uneven surfaces as the barriers?" he answered, "No.  I didn't see any unevenness or change in

9

the pattern that would obstruct someone in a wheelchair from utilizing it."  *Id.* at 171:9-17.  He

10

also opined that the path of travel was "even enough to get in and out of the store with or without a

11

wheelchair but, like with all asphalt, there are irregularities and splitting of joints and ravelling . . .

12

that would be the normal wear and tear."  *Id.* at 181:15-22.

13

Anderson said he looked at Bluhm's photographs "but they're not germane to this

14

property."  *Id.* at 94:10-12.  Anderson's "overall, overarching" response to Bluhm's testimony was

15

that "he was not addressing the property as a preexisting property" and that "generally, he was

16

looking at things technically for a new building and not a preexisting building, and he cited

17

standards that he didn't define and that do not apply."  *Id.* at 102:10-19.  Indeed, Anderson

18

testified repeatedly that the Store has no obligation to remove any barriers because the ADA does

19

not apply to existing structures so that barriers "can remain in the store forever."  *See, e.g.,* Moore

20

Decl. Exh. D, Anderson Depo. at 134:21-24.  ECF No. 41-4.[4]

21

Roberts, testifying as PMK, affirmed that Defendants have done nothing since the passage

22

of the Americans with Disabilities Act, 42 U.S.C. §§ 12181-12189 ("ADA"), in 1990 to provide

23

an accessible path of travel for people in wheelchairs from the parking to the Store entrance.

24

Moore Decl. Exh. B, Transcript of Deposition of Christine Roberts as one of Defendants' Persons

25

26

_____

27

[4]  With respect to all alleged access barriers about which he was questioned, Anderson repeats that the "ADA applies to new work only" (Anderson Depo. at 127:13), not to the Store or even to the 1995 remodel because the Store is an existing facility, pre-dating the ADA.  *See id.* at 145:14-23,

28

146:23-24, 203:17-204:7, 205:18-22, 207:17-21, 208:4-8, 209:2-212:15, 209:21-214:20.

United States District Court
Northern District of California

Most Knowledgeable ("Roberts PMK Depo.") at 15:8-12.  ECF No. 41-2.  Defendants argue that this is immaterial, however, because "the path of travel to the store already complies with the requirements of the ADA."  Defendants' CSF Response No. 106.  In addition, as of her deposition on February 10, 2021, fourteen months after this case was filed, Roberts, testifying as one of Defendants' PMKs, stated that she "presently [has] no bids and no idea how much it would cost to install accessible parking at Roberts Market."  Moore Suppl. Decl. Exh. A, Roberts PMK Depo. 23:9-15.  ECF No. 48-1.

Plaintiff testified that during his visit to the Store in September 2019, he did not see any employees outside the Store that could have assisted him, nor any way for him to summon them such as a buzzer or intercom, nor any signs with information about how to get service if, as a wheelchair user, he could not get into the Store.  Hernandez Decl., ¶ 11.  Defendants dispute Plaintiff's testimony that no Store employees were available to assist him outside the Store based on Anderson's visit three months after Plaintiff's visit, during which Anderson says he observed an elderly patron – not Plaintiff – receiving help from a Store employee to release a cart that was stuck on a curb.[5]  Anderson Depo. at 165:14-21, 192:12-18.

### b.   Deli Counter

Once inside, Plaintiff testified that he had a difficult time placing an order at the deli counter because it was taller than he was (Hernandez Decl. ¶ 12; Hernandez Depo. at 29:5-14, 71:1-8; FAC ¶ 10(b)) and the ticket machine at the deli counter was too high for him to reach and was obstructed by merchandise.  Hernandez Decl. ¶ 13; Hernandez Depo. at 69:8-22.  He testified that he did not see any Store employees to take his order nor any signs about how to get an employee's attention to take his order.  Hernandez Decl. ¶ 14; Hernandez Depo. at 29:15-30:3,

---

[5] Anderson testified that on December 19, 2019, he witnessed employees at the Store "come out, either talk over the counters or come out with notepads and help people with -- help a lady -- a quite elderly lady get her shopping cart and get inside the store, and they were available to take orders with notepads and just help in any way that they could" (*Id*. at 165:14-166:10; 166:18-25), though he did not see anyone in a wheelchair during that visit.  *Id*. at 166:15-17.  He and the deposing attorney refer to a photograph of that elderly patron that is "page 77 of your – of Exhibit 2."  *See* Anderson Depo. at 192:8-18.  Neither the photograph nor the unidentified document to which they refer was submitted to the Court.

United States District Court
Northern District of California

30:21-23**.**  He testified that he waited several minutes, waving his hand and calling out, before he got the attention of a worker who remained behind the counter to take his order.  Hernandez Depo. at 30:4-17, 31:15-17, 32:18-23; Hernandez Decl. ¶ 12.  He raised his voice in order to be heard over the counter.  *Id.*; FAC ¶ 10(b).

Bluhm testified that the deli counter surfaces are over fifty-three inches high and that due to the configuration of the counters and the merchandise displayed inside them, the height of the counters would obstruct a wheelchair-seated person from being able to see and be seen by the workers behind the counter.  Bluhm Decl. ¶ 36, Exh. O.  ECF. No. 43-15.  Bluhm also observed that the "take-a-number" ticket dispenser was over fifty-eight inches high and that the 30-inch-by-48-inch space adjacent to the ticket dispenser was obstructed by stored merchandise, requiring one to reach approximately twenty-two inches across the obstruction to take a ticket.  *Id.* ¶ 34, Exh. N.  ECF. No. 43-14.

Defendants deny, once again, that Plaintiff visited the store on September 14, 2019.  They do not dispute that there was no sign indicating how to get a Store employee's attention and they argue that, though the location of the ticket dispenser is undisputed, it is immaterial because the ticket dispenser is "not in the least bit necessary for ordering sandwiches."  Defendants' CSF Response No. 19.

Defendants do, however, dispute that Plaintiff experienced difficulty ordering at the deli counter and that he did not see store employees available to assist him because "[t]here are approximately 20 employees on the store floor at any given time, all easily identifiable by their uniforms and name tags, any of whom Plaintiff could approach for assistance without being able to see over the counter, and employees behind the counter are constantly coming around to the front of the counter with notepads and pens to take sandwich orders from customers."  Defendants' CSF Response No. 18, citing Paetkau Decl. Exh. 3, Deposition Transcript of Defendants' second PMK Edith Zuniga ("Zuniga Depo.") at 19:19-23:24 (ECF. No. 45-1); Anderson Depo. at 103:5-9, 106:12-15, 165:14-21, 166:18-25.  However, Zuniga herself testified that it is disabled people themselves who need to find someone to help them.  *See, e.g.,* Zuniga Depo. at 20:23-21:1; 23:11-24.

8

United States District Court
Northern District of California

1    In line with his opinion that the ADA applies to new work only, Anderson claims that the

2    ADA does not contain any standards for existing buildings as to counter height.  Anderson Depo.

3    at 119:13-120:13.  At Roberts' PMK deposition fourteen months after this case was filed, Roberts

4    stated she had not determined how much it would cost or how long it would take to lower the deli

5    service counter (*id.* 43:12-19, 46:11-14), nor had she obtained any estimates or bids for that work.

6    *Id.* at 44:15-17.

7                          **c.      Second-Floor Restroom**

8    Plaintiff also testified that while he was in the Store, he was unable to use the second-floor

9    restroom to which he was directed by an employee because there was no elevator or other

10    accessible route, nor were there signs indicating the location of an accessible restroom.  FAC ¶

11    10(c); Hernandez Depo. at 28:24-29:3, 34:14-25, 36:3-37:14; Bluhm Decl. ¶ 64; Roberts PMK

12    Depo. at 14:12-19; Hernandez Decl. ¶ 15.  As a result, Plaintiff had to empty his bladder in his

13    vehicle, which he found "uncomfortable and embarrassing."  *Id.*; Hernandez Depo. at 43:17-20.

14    In addition to disputing that Plaintiff visited the Store, Defendants remarkably dispute "that

15    he actually had to use the restroom" (Defendants' CSF Response Nos. 23, 26) and "that an

16    employee directed Plaintiff to the upstairs restroom" because he could not describe the employee.

17    Defendants' CSF Response No. 25.  They do not dispute that the bathroom was on the second

18    floor (Defendants' CSF Response No. 23) but assert that it is immaterial because there are

19    accessible bathrooms in the plaza across the street (Paetkau Decl., Exh. 2, Roberts PMK Depo. at

20    13:17-23) (ECF No. 45-1) and claim that Store employees "know to direct customers to the

21    accessible bathroom in the plaza across the street."  *Id.* at 15:18-23.  Defendants acknowledge that

22    "there was no prohibition against customers using the restroom in September 2019."  Defendants'

23    CSF Response No. 24.

24    In his motion, Plaintiff acknowledges that providing a restroom on the first floor would

25    likely not be readily achievable, that Defendants have represented that they have now closed the

26    restroom to the public entirely and that, for these reasons, Plaintiff "is not seeking injunctive relief

27    relating to the restroom through this motion."  Mot. p. 10.

28

d.      **Additional Barriers**

In addition to the barriers Plaintiff personally encountered in his September 14, 2019 visit (FAC ¶¶ 10(a)-(c)), he identified additional barriers relating to his disability at the Store during the joint site inspection in this action which took place on February 27, 2020.  Hernandez Decl. ¶¶ 20-41; FAC ¶¶ 11(a)-(oo).[6]  Plaintiff and his expert Bluhm testified as to the existence of barriers to access at the time of Plaintiff's visit and those they found during the site inspection.  Anderson concurred with the measurements and observations made by Bluhm, saying that "what he measured is what he found, but they're not germane to an existing facility" (Anderson Depo. at 94:13-25) and "I'm not in any disagreements with his photos or his measurements."  *Id.* at 96:19-21.  To date, no modifications to public areas of the Store have been made with regard to any of the additional barriers discovered during the February 27, 2020 joint site inspection.  Stipulation Regarding Undisputed Facts ¶ 2.  ECF No. 36.

3.      **1995 Remodel Of The Store**

In 1995, part of the Store underwent a remodel, including the installation of a new deli counter, meat counter, five cash registers, grocery shelving, automatic sliding doors, and accompanying work on electrical, plumbing, and gas systems.  Roberts PMK Depo. at 21:10-20; 25:7-19; 25:24-26:4.  ECF No. 41-2.  Although this work occurred after the ADA's effective date in 1993, these modifications were not made in accordance with ADA standards.  *See, e.g.,* Bluhm Decl. ¶ 36.  Plaintiffs argue that the work done in 1995 constituted an alteration under the ADA.  *See, e.g.,* Mot. at p. 9.

Anderson testified in his deposition that he believes the 1995 remodel was not substantial, as he has "seen no indication that there has been a significant architectural remodel or addition, and there's been no change of use.  It's a like-kind replacement."  Anderson Depo. at 135:9-14.  ECF No. 45-1.  Anderson testified that all the work done in 1995 falls within the work the ADA

---

[6] The way the FAC is drafted makes it sound like Plaintiff encountered the three barriers listed in paragraph 10(a)-(c) and became aware of the 41 additional barriers listed in paragraph 11(a)-(oo). In fact, the barriers listed in paragraph 10 are repeated in paragraph 11, and Plaintiff's deposition testimony and declaration make clear that he also encountered some of the other barriers listed in paragraph 11.

excludes as "alterations" because "the ADA does not consider interior decorating, rebranding, normal maintenance, re-roofing, painting, asbestos abatement, or change to the electrical or mechanical systems to be alterations unless they affect usability.  So all the work they did out there is within the confines of that sentence."  *Id.* at 111:19-25.  He also testified that "building department records don't reflect any substantial -- anything that required getting a permit that would be a trigger to going beyond and -- beyond what is readily achievable."  *Id.* at 135:18-22. So, for example, for purposes of this motion, Defendants do not dispute that they could have installed an accessible deli counter at no additional cost when they replaced it in 1995, but they dispute that the ADAAG standards applied to the counter.  Defendants' CSF Response No. 108.

### 4.    Plaintiff's Desire To Return To The Store

Plaintiff testified that he would like to return to the Store once it is made fully accessible to him.  Hernandez Decl. ¶ 19.  In fact, Plaintiff attempted to visit the Store with his brother in late 2020 to buy sandwiches, but "due to the difficulty [he] had encountered during his September 2019 visit, [he] decided not to go in and waited in the car while [his] brother went and bought the sandwiches."  Hernandez Decl. ¶ 18.

### B.    Procedural History

Plaintiff filed this case on December 3, 2019.  The matter proceeded under General Order 56, which stayed all proceedings except for the requirement that the parties conduct a joint inspection of the facility, meet and confer to discuss all claimed access violations and proposed corrections, and then attend mediation if unable to settle.  ECF No. 5.  The Parties conducted the joint site inspection of the Store and an in-person meet and confer on February 27, 2020, then they attended mediation on May 15, 2020.  Moore Decl. ISO Plaintiff's Motion for Leave to File a First Amended Complaint ("Moore Decl. ISO Motion to Amend") ¶ 2.  ECF No. 21-2.  The parties were unable to settle so the Court issued a Case Management Order, setting a deadline of October 26, 2020 to seek leave to amend.  ECF No. 20.

During the pendency of this action, additional alleged barriers to access were identified at the Store.  Moore Decl. ISO Motion to Amend ¶ 3.  On August 6, 2020, Plaintiff filed his FAC, which included allegations that he personally encountered three access barriers: (1) a sloped,

1    uneven path of travel with a large crack from the designated accessible parking space to the Store

2    entrance; (2) the height of the deli counter; and (3) inaccessible second-floor restroom (FAC ¶ 10),

3    plus additional access barriers that relate to his disability of which he became aware during the

4    course of this litigation. *See* FAC ¶ 11.  The FAC includes claims under Title III of the ADA for

5    "Denial of 'Full and Equal' Enjoyment and Use," "Failure to Remove Architectural Barriers in an

6    Existing Facility," "Failure to Design and Construct an Accessible Facility," "Failure to Make an

7    Altered Facility Accessible," "Failure to Modify Existing Policies and Procedures," and "Failure

8    to Maintain Accessible Features."  FAC ¶¶ 16-33.  The FAC also includes claims under

9    California's Unruh Civil Rights Act (Cal. Civ. Code § 51(f)) (FAC ¶¶ 34-41) and California

10   Health and Safety Code § 19953.  *Id*. ¶¶ 42-46.  Plaintiff seeks (1) injunctive relief, preventive

11   relief, or any other relief the Court deems proper; (2) statutory minimum damages under Section

12   52(a) of the California Civil Code ("Unruh Act"); (3) attorneys' fees, litigation expenses, and costs

13   of suit; and (4) interest at the legal rate from the date of the filing of this action.

### III.   LEGAL STANDARD

15        Summary judgment is proper where there is "no genuine dispute as to any material fact and

16   the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The party moving

17   for summary judgment bears the initial burden of identifying those portions of the pleadings,

18   discovery and affidavits that demonstrate the absence of a genuine issue of material fact.  *Celotex*

19   *Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  Material facts are those that may affect the outcome

20   of the case, and a dispute as to a material fact is genuine if there is sufficient evidence for a

21   reasonable jury to return a verdict for the nonmoving party.  *Anderson v. Liberty Lobby, Inc.*, 477

22   U.S. 242, 248 (1986).

23        If the moving party meets its initial burden, the opposing party must then set forth specific

24   facts showing that there is some genuine issue for trial.  Fed. R. Civ. P. 56(c)(1); *Anderson*, 477

25   U.S. at 250.  All reasonable inferences must be drawn in the light most favorable to the

26   nonmoving party.  *Olsen v. Idaho State Bd. of Med.*, 363 F.3d 916, 922 (9th Cir. 2004).  However,

27   it is not the task of the Court "'to scour the record in search of a genuine issue of triable fact."

28   *Keenan v. Allan*, 91 F.3d 1275, 1279 (9th Cir. 1996).  The nonmoving party has the burden "to

identify with reasonable particularity the evidence that precludes summary judgment." *Id.* Thus, "[t]he district court need not examine the entire file for evidence establishing a genuine issue of fact, where the evidence is not set forth in the opposing papers with adequate references so that it could conveniently be found." *Carmen v. S.F. Unified Sch. Dist.*, 237 F.3d 1026, 1031 (9th Cir. 2001); *Christian Legal Soc. Chapter of Univ. of Cal. v. Wu*, 626 F.3d 483, 488 (9th Cir. 2010) ("Judges are not like pigs, hunting for truffles buried in briefs.") (citations omitted).

"While the evidence presented at the summary judgment stage does not yet need to be in a form that would be admissible at trial, the proponent must set out facts that it will be able to prove through admissible evidence." *Norse v. City of Santa Cruz*, 629 F.3d 966, 973 (9th Cir. 2010) (citing Fed. R. Civ. P. 56(c) ("An affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated.")). Still, to survive summary judgment, the nonmoving party "must set forth non-speculative evidence of specific facts, not sweeping conclusory allegations." *Cafasso, U.S. ex rel. v. Gen. Dynamics C4 Sys., Inc.*, 637 F.3d 1047, 1061 (9th Cir. 2011) (citations omitted). If the nonmoving party fails to identify such evidence, or if it offers evidence that is "merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson,* 477 U.S. 242, 249–50 (1986) (citations omitted).

## IV.   DISCUSSION

### A.   Threshold Issues

#### 1.   Defendants' Challenge To Plaintiff's Standing: Article III "Case" Or "Controversy" Requirement

Defendants argue that Plaintiff did not actually visit the Store on September 14, 2019, so there is no case or controversy and Plaintiff lacks standing to assert his claims. *See* Opp'n. pp. 2-3. In order to establish standing to bring a federal lawsuit, a plaintiff must satisfy the "case" or "controversy" requirement of Article III of the Constitution by showing three things:

> First [he must have] suffered an injury in fact—an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical. Second, there must be a causal connection between the injury and the conduct complained of . . . . Third, it must be likely, as opposed to merely

United States District Court
Northern District of California

speculative, that the injury will be redressed by a favorable decision.

*Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992) (quotations and citations omitted); *see also Parr v. L & L Drive-Inn Rest.*, 96 F. Supp. 2d 1065, 1077-79 (D. Haw. 2000) (discussing standing in context of accessibility of restaurant under the ADA). As the Ninth Circuit has stated, "[t]he Supreme Court has instructed us to take a broad view of constitutional standing in civil rights cases, especially where, as under the ADA, private enforcement suits 'are the primary method of obtaining compliance with the Act.'" *Doran v. 7-Eleven, Inc.*, 524 F.3d 1034, 1039 (9th Cir. 2008) (citation and quotation marks omitted).

In the case at bar, the second and third elements of standing have not been challenged and are not, in any event, at issue, as Defendants' failure to remove alleged architectural barriers in violation of with Title III caused the injury alleged and a favorable decision granting Plaintiff an injunction requiring Defendants to comply with the ADA by removing the barriers would redress the alleged harm. Defendants, however, argue that Plaintiff never visited the Store, thereby eliminating the possibility that Plaintiff actually suffered the "injury in fact" required for standing.

### a.      "Injury In Fact"

The Ninth Circuit has held that a disabled individual who is currently deterred from patronizing a public accommodation due to a defendant's failure to comply with the ADA has suffered "actual injury" and that a plaintiff who is threatened with harm in the future because of existing or imminently threatened non-compliance with the ADA suffers "imminent injury." *Pickern v. Holiday Quality Foods Inc.*, 293 F.3d 1133, 1138 (9th Cir. 2002).

There is no genuine dispute that Plaintiff suffered an "injury in fact." Plaintiff produced substantive evidence that he did visit the Store on September 14, 2019. In addition to his deposition testimony and declaration, he submitted a receipt for sandwiches and drinks purchased at the Store on that date, as well as his son's football schedule at a nearby field, corroborating his reason for being in the area on that date. Plaintiff testified about the access barriers he faced when approaching the Store entrance, when placing his order at the deli counter, and in finding an accessible restroom, which demonstrate a concrete, particularized injury.

In addition, these conditions forced him to wait in the car on a subsequent visit while his

14

1   brother entered the Store to get food.  Plaintiff has thus shown that he is currently deterred from

2   patronizing the Store due to Defendants' failure to comply with the ADA and hence has suffered

3   imminent injury.  *See, e.g.*, *Parr*, 96 F. Supp. 2d at 1079 (holding that "Plaintiff's desire to

4   patronize Defendant's restaurant free from discrimination is clearly a cognizable interest for

5   purposes of standing."); *Doran*, 524 F.3d at 1041 ("Allegations that a plaintiff has visited a public

6   accommodation on a prior occasion and is currently deterred from visiting that accommodation by

7   accessibility barriers establish that a plaintiff's injury is actual or imminent.").  Because Plaintiff

8   has visited the Store in the past, has actual knowledge of access barriers at the Store, and would

9   shop there if it were accessible, he has sufficiently established injury in fact that is concrete and

10   both actual *and* imminent for purposes of standing.

11      Defendants have presented no contradictory evidence, but instead attempt to "dispute" that

12   he ever visited the Store on September 14, 2019, as well as multiple other facts in Plaintiff's

13   SSUF, purely by argumentation and accusation:

> [Plaintiff's] history of serial and professional ADA litigation is
> critically damaging to the credibility of his claim that he visited
> Roberts Market.  Paetkau Decl. ¶ 2.  When questioned at his
> deposition, Plaintiff could not provide even the barest description of
> any of the employees with whom he claims to have interacted at the
> store (not even the employee or the employees' gender).  Paetkau
> Decl. Exh. 4, Hernandez Depo. at 31:24-32:8, 34:14-35:9.  No one
> from Roberts Market recalls having ever seen [Plaintiff] at the store.
> Roberts Decl. ¶¶ 3-4.

19   Defendants' CSF Response Nos. 5-11.  Defendants assert that these arguments necessitate

20   "credibility determinations" that "cannot be made on summary judgment."  Opp'n. p. 3.

21      The Court disagrees.  Defendants fail to present "non-speculative evidence of specific

22   facts" (*Cafasso*, 637 F.3d at 1061) to challenge standing or to raise any issue of material fact

23   precluding summary judgment.  Instead, Defendants provide nothing more than "sweeping

24   conclusory allegations" (*id.*), accusations, and speculation, none of which creates a genuine

25   dispute requiring trial.

26      **b.   Plaintiff's History of Serial ADA Litigation**

27      Defendants rely heavily on the litigation history of Plaintiff and his counsel to attack

28   Plaintiff's credibility.  However, a party cannot create a dispute of fact by simply questioning the

United States District Court
Northern District of California

1   credibility of a witness.  *Bodett v. CoxCom, Inc.,* 366 F.3d 736, 740 n.3 (9th Cir. 2004); *see also*

2   *Siddiqui v. AG Communication Systems Corp.*, 233 F. App'x 610, 613 (9th Cir. 2007) (holding

3   that challenges to "the credibility and bias of potential witnesses do not create triable issues of

4   fact").

5          In their Opposition, Defendants argue that Plaintiff's "history of serial and professional

6   ADA litigation is critically damaging to the credibility of his claims because it demonstrates a

7   pattern and practice, a *modus operandi*, of misrepresenting the motivation behind his ADA claims,

8   *i.e.,* that his motivation is not to pursue recourse for an actual injury, but to make money for

9   himself and his attorneys."  Opp'n. p. 2.  The Ninth Circuit has addressed this credibility argument

10  head-on, recognizing the importance of serial litigation to enforce the ADA:

> Courts must tread carefully before construing a Disability Act
> Plaintiff's history of litigation against him.  As we have noted more
> than once, "[f]or the [Disabilities Act] to yield its promise of equal
> access for the disabled, it may indeed be necessary and desirable for
> committed individuals to bring serial litigation advancing the time
> when public accommodations will be compliant with the [Disabilities
> Act]."  We must therefore be "particularly cautious" regarding
> "credibility determinations that rely on a Plaintiff's past [Disabilities
> Act] litigation."

16  *Antoninetti v. Chipotle Mexican Grill, Inc.*, 643 F.3d 1165, 1175 (9th Cir. 2010) (citations

17  omitted).  In addition, the Court notes that Congress has chosen to empower private citizens to

18  ensure ADA compliance at the venues they frequent, as the ADA provides a private right of action

19  for "any person who is being subjected to discrimination on the basis of disability in violation of"

20  Title III.  *Parr*, 96 F. Supp. 2d at 1082 (citing 42 U.S.C. § 12182(a)(1))**.**  "Civil rights law depends

21  heavily on private enforcement . . . . Attempts to weaken the remedies available under the ADA

22  are attacks on the ADA itself and their success would make the ADA an empty promise of

23  equality."  *Id.* (citing Committee Print, Vol. II, 101st Cong., 2d Sess., at 1481-82 (1990)).

24  Moreover, the ADA's "provision *for injunctive relief only* removes the incentive for most disabled

25  persons who are injured by inaccessible places of public accommodation to bring suit."  *D'Lil v.*

26  *Best Western Encina Lodge & Suites*, 538 F.3d 1031, 1040 (9th Cir. 2008) (citation omitted,

27  emphasis added).

28          Although the Court must draw all reasonable inferences in favor of Defendants as the

United States District Court
Northern District of California

16

nonmoving parties, the Court here applies the caution urged by the Ninth Circuit not to misconstrue Plaintiff's previous ADA litigation to undermine his present case.  Furthermore, Plaintiff's personal history with respect to the Store militates against drawing negative inferences from Plaintiff's ADA enforcement because he grew up in the area and currently lives a short distance away from the Store, he visited the Store both before and after he became disabled, he has a son who plays football games nearby, and he visited the Store on September 14, 2019 to purchase food to eat during one such game.  Particularly given these facts, Plaintiff's past ADA litigation does not serve to undermine his credibility.  *See id*. ("[O]n this record, we cannot agree that [Plaintiff's] past ADA litigation was properly used to impugn her credibility.")

> **c.**      **Inability Of Roberts Or Other Store Employees To Remember Seeing Plaintiff**

Defendants attempt to discredit Plaintiff by citing the Roberts declaration that she doesn't recognize Plaintiff and has "no knowledge" of him visiting the Store other than during the site inspection, and that other staff members who would have been working on September 14, 2019 did not remember seeing him, as evidence that Plaintiff did not actually visit the Store on that date. Roberts Decl. ¶ 4.  However, the Central District rejected the same argument that a Title III plaintiff did not visit a public accommodation based upon testimony that employees "do not remember" seeing them.  "[T]he fact that [defendant's employee] did not see Plaintiff personally on that date is not sufficiently probative to discredit Plaintiff's testimony nor to dispute the fact that Plaintiff was actually there." *Langer v. Adriatic Vacation Club, Inc.,* 2015 U.S. Dist. LEXIS 143398, at *11 n.4 (C.D. Cal. Oct. 21, 2015).  Similarly, here, the fact that Roberts did not personally see Plaintiff on that date is not sufficiently probative to discredit Plaintiff's testimony nor to dispute the fact that Plaintiff was actually there.

In addition, the Court will not consider the hearsay statements contained in Roberts' declaration wherein she asserted none of the "other employees" remembered seeing Plaintiff in the Store.  Further, even if it's true that Roberts and miscellaneous, unidentified Store employees do not remember seeing Plaintiff during his visit, this still does not establish that Plaintiff was not there, nor controvert his testimony and documentary evidence (receipt, football schedule) that he

1    was there.

2         Moreover, Plaintiff points out that Roberts testified at her February 10, 2021 deposition

3    that she had not, up to that point, asked any employees about Plaintiff's visit.  Supplemental

4    Moore Decl. ¶ 2, Exh. A, Roberts PMK Depo. at 53:15-17 ("Q. Have you talked to any of

5    Roberts' employees regarding Mr. Hernandez's visit to the store?  A. No.").  ECF No. 48-1.  If

6    Roberts questioned these employees after her February 2021 deposition, it is not surprising that

7    they could not recall one particular customer from almost eighteen months prior.

8                   **d.      Inability Of Plaintiff To Remember Store Employees**

9         Similarly, Defendants cannot establish a triable issue of fact by attacking Plaintiff's

10   credibility on the basis that during his deposition he did not recall specifics about the employees

11   he interacted with almost eighteen months earlier.  Such a tenuous attack on Plaintiff's credibility

12   fails to create genuine disputes of material fact requiring a trial.  *See Bodett*, 366 F.3d at 740 n.3

13   (noting "party cannot create a dispute of fact simply by questioning the credibility of a witness");

14   *see also Siddiqui,* 233 F. App'x at 613 (holding that challenges to "the credibility and bias of

15   potential witnesses do not create triable issues of fact").

16                 **e.      Plaintiff's Choice Of Parking Location During Site Visit**

17        Finally, Defendants make much of the fact that when Plaintiff arrived at the Store for the

18   joint site inspection, he parked in the plaza across the street instead of in the accessible parking

19   stall in the Store's parking lot.  They argue that he would not have parked there if he had

20   previously been to the Store.  However, the location in which Plaintiff chose to park is irrelevant

21   to whether he had previously visited the Store.  More to the point, Defendants cherry-pick their

22   deposition cites by highlighting the section where Plaintiff "admits" that he parked across the

23   street but fail to include his answer to the very next question, his testimony as to the reason he

24   parked there: "Because we went to a coffee shop [across the street] first and then we crossed the

25   street."  Hernandez Depo. at 45:9-11.

26        In the face of Plaintiff's testimonial and documentary evidence, Defendants' conclusory

27   arguments and speculation that Plaintiff did not visit the Store constitute no meaningful challenge

28   to standing, nor do they create justifiable inferences in Defendants' favor or factual disputes so as

United States District Court
Northern District of California

18

to preclude summary judgment.  Accordingly, Plaintiff has adequately established the "irreducible constitutional minimum of standing" in order to bring this action because there is no genuine dispute (1) that Plaintiff visited the Store in September 2019 where he experienced an injury in fact (2) that was caused when he personally encountered alleged barriers to access and (3) that an order remedying these alleged barriers would redress the injury.

### 2.    Standing To Challenge Additional Access Barriers

Defendants contend that Plaintiff's claim is limited to the three barriers he alleged he personally encountered.  Defendants cite to ECF No. 21-1, the Proposed First Amended Complaint ("Proposed FAC") attached to Plaintiff's Motion to Amend, rather than the operative FAC, ECF No. 26, to claim that "Plaintiff has made no attempt to amend his complaint to allege that he personally encountered any additional access barriers."  Opp'n. pp. 3-4.  However, the Proposed FAC is almost identical to the operative FAC and both contain Paragraph 11(a)-(oo), which clearly alleges additional barriers relating to Plaintiff's disability, spanning almost four pages of the FAC (FAC ¶ 11(a)-(oo), pp. 3-7), and the redline that compares the proposed FAC with the original complaint makes absolutely clear that these additional barriers were added to the FAC.  Moore Decl. ISO Motion to Amend ¶ 7, Exh. B.  ECF No. 21-3.  Plus, Plaintiff began his Motion to Amend with the statement that the Proposed FAC "substantively adds additional access barriers which relate to Plaintiff's disabilities, which were identified subsequent to the filing of the action."  Motion to Amend p 2.

It is well-established in the Ninth Circuit that:

> when an ADA plaintiff has suffered an injury-in-fact by encountering a barrier that deprives him of full and equal enjoyment of the facility due to his particular disability, he has standing to sue for injunctive relief as to that barrier and other barriers related to his disability, even if he is not deterred from returning to the public accommodation at issue.

*Chapman v. Pier 1 Imports (U.S.) Inc.,* 631 F.3d 939, 944 (9th Cir. 2011) (*en banc*); *see* 42 U.S.C. § 12188(a)(1) (ADA remedies available "to any person who is being subjected to discrimination on the basis of disability"); *see also Lujan*, 504 U.S. at 563 (parties have standing to sue provided they are "among the injured").  As the Ninth Circuit has stated:

1

2

3

4

> a rule limiting a plaintiff to challenging the barriers he or she had encountered or personally knew about would burden businesses and other places of public accommodation with more ADA litigation, encourage piecemeal compliance with the ADA, and ultimately thwart the ADA's remedial goals of eliminating widespread discrimination against the disabled and integrating the disabled into the mainstream of American life.

5   *Doran*, 524 F.3d at 1047.  Thus, when Plaintiff encountered alleged architectural barriers at the

6   Store, discrimination occurred as to all barriers related to his disability.  *See Parr*, 96 F. Supp. 2d

7   at 1081.  Plaintiff should not be – and is not – required to encounter every barrier *seriatim* within

8   the Store to obtain effective relief.  *Id.*  People with disabilities are not required to engage in a

9   futile gesture if they have actual notice that a person or organization covered by the ADA does not

10  intend to comply with its provisions.  *See* 42 U.S.C. § 12188(a)(1).

11          The legal interest at stake here is Plaintiff's right to patronize the Store free from

12  discrimination.  Because the Court has found that Plaintiff has standing to pursue injunctive relief

13  as to the access barriers he actually encountered and because he need not engage in futile gestures

14  of attempting to do what other barriers prevent him from doing, Plaintiff also has standing to

15  challenge access barriers that relate to his use of a wheelchair that have been identified by his

16  expert and listed in FAC ¶ 11.

17          In sum, the Court is satisfied that Plaintiff did visit the Store on September 14, 2019 and

18  that he did encounter certain barriers to full use of the premises.  He attempted to return to the

19  Store once and, given the proximity to his house and the location of his son's football games, is

20  likely to return again.  Accordingly, Plaintiff has standing to sue for all the ADA violations listed

21  in his FAC.

22          **3.      The Parties' Experts**

23          Under Federal Rule of Evidence 702, a witness may qualify as an expert if he possesses the

24  "knowledge, skill, experience, training or education." Fed. R. Evid. 702.[7]  Qualification will be

25  _____

26  [7] Rule 702 of the Federal Rules of Evidence provides that expert opinion evidence is admissible if:
    (1) the witness is sufficiently qualified as an expert by knowledge, skill, experience, training, or

27  education; (2) the scientific, technical, or other specialized knowledge will help the trier of fact to
    understand the evidence or to determine a fact in issue; (3) the testimony is based on sufficient

28  facts or data; (4) the testimony is the product of reliable principles and methods; and (5) the expert
    has reliably applied the relevant principles and methods to the facts of the case.  Fed. R. Evid. 702.

United States District Court
Northern District of California

1  granted as long as the witness shows sufficient expertise through one or more of these bases.

2  *Sterner v. U.S. Drug Enf't Agency*, 467 F. Supp. 2d 1017, 1033 (S.D. Cal. 2006).  Under the

3  Federal Rules, however, "the trial judge must ensure that any and all [expert] testimony or

4  evidence admitted is not only relevant, but reliable." *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 142

5  (1997) (quoting *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 589 (1993)

6  (footnote omitted)); *Pyramid Techs., Inc. v. Hartford Cas. Ins. Co*., 752 F.3d 807, 814 (9th Cir.

7  2014) (finding the expert's "many relevant certifications and decades of relevant experience

8  render him qualified to issue his expert opinion" and that the test "is not the correctness of the

9  expert's conclusions but the soundness of his methodology").  A trial court has broad discretion in

10  determining the reliability and admissibility of expert testimony.  *Joiner*, 522 U.S. at 142; *United*

11  *States v. Espinosa*, 827 F.2d 604, 611 (9th Cir. 1987) ("The decision to admit expert testimony is

12  committed to the discretion of the district court and will not be disturbed unless manifestly

13  erroneous.").

14      In addition, Federal Rule of Evidence 704(a) provides that expert testimony that is

15  "otherwise admissible is not objectionable because it embraces an ultimate issue to be decided by

16  the trier of fact."  Fed. R. Evid. 704(a).  Nevertheless, although expert testimony concerning an

17  ultimate issue is not *per se* improper, "an expert witness cannot give an opinion as to her legal

18  conclusion, *i.e.*, an opinion on an ultimate issue of law."  *Hangarter v. Provident Life & Acc. Ins.*

19  *Co.*, 373 F.3d 998, 1016 (9th Cir. 2004) (citation omitted).

20      At summary judgment, the court cannot weigh the reliability of one expert's methods

21  against another expert's methods or resolve conflicts between their opinions.  *See D'Lil v*

22  *Riverboat Delta King*, 59 F. Supp. 3d 1001, 1009 (E.D. Cal. 2014) (refusing to resolve conflict

23  between experts on summary judgment); *Scharf v. U.S. Att'y Gen.,* 597 F.2d 1240, 1243 (9th Cir.

24  1979) (holding that resolution of issues of fact based on conflicting expert testimony is "not the

25  court's function on summary judgment").

26      In his declaration, Plaintiff's expert Bluhm lays out his qualifications and experience as an

27  expert in evaluating accessibility and surveying facilities for compliance with the requirements of

28  ADA and ADAAG and submits his resume as the first exhibit to his declaration.  In stark contrast,

United States District Court
Northern District of California

21

1    Defendants purport to offer Anderson as their "accessibility expert," but neither they nor Anderson

2    provide any evidence whatsoever regarding his qualifications as an expert on the ADA or

3    ADAAG.  There is no deposition testimony or declaration establishing his expert credentials.

4           In *Lopez v. Catalina Channel Express, Inc.*, 974 F.3d 1030 (9th Cir. 2020), the Ninth

5    Circuit found the declaration of plaintiff's private investigator "patently insufficient" to meet

6    plaintiff's initial burden to make a plausible showing that the proposed remedy is readily

7    achievable because he did not explain "why he is qualified to opine on this issue, or even how he

8    reached his conclusion."  *Id.* at 1039.  Furthermore, the investigator only identified the problem

9    rather than addressing the question of whether remediating the barrier was "readily achievable" by

10   explaining, for example, how much the proposed remedy would cost and why that cost does not

11   exceed the potential benefits.

12          As in *Lopez*, Defendants' expert Anderson submits no evidence concerning why he is

13   qualified to opine on any issue related to the ADA, including the central issues of whether the path

14   of travel and the height of the deli counter constitute accessibility barriers and whether their

15   remediation is readily achievable.  Anderson's repeated assertion that under the ADA an existing

16   facility like the Store need do nothing to facilitate access casts further doubt upon his

17   understanding of ADA requirements.  As a result, Anderson's deposition testimony cannot

18   meaningfully be called "expert."  Although he states opinions that are relevant to the issues in this

19   case, he has not demonstrated that such opinions are reliable by demonstrating his expertise

20   through any of the possible bases of knowledge, skill, experience, training or education.  *See, e.g.,*

21   *Plush Lounge Las Vegas LLC v. Hotspur Resorts Nev. Inc.*, 371 F. App'x 719, 720 (9th Cir. 2010)

22   (finding that declarants failed to provide adequate foundational information about what training—

23   whether in the classroom or on the job—gave rise to their ability to define a market for antitrust

24   purposes) (citing *Daubert*, 509 U.S. at 590).

25          Moreover, Anderson admits he took no measurements of his own of the alleged barriers at

26   the Store.  Hence, Anderson fails to provide any factual foundation for his opinions and fails to

27   testify regarding his method for reaching them.  In addition, although Anderson refers to his

28   "expert" report in his deposition and Defendants refer to it in their Opposition, this report is not in

United States District Court
Northern District of California

evidence before the Court.  On this basis, the Court sustains Plaintiff's objection to the report's conclusions.  *See* Reply n.2.

Finally, Anderson fails to propose any means of rectifying the alleged barriers or provide cost estimates for Plaintiff's proposed barrier removal.  Instead, he merely opines that Plaintiff's proposals are not "readily achievable," a central issue to be determined by the Court on summary judgment.

Defendants submit no other testimony or evidence, expert or otherwise, regarding alleged access barriers at the Store, whether Plaintiff's proposed solutions are "readily achievable" and costs to remedy such barriers.  Hence, here the Court is not faced with weighing the reliability of experts' methods or conclusions or with resolving conflicts between their opinions because the only evidence before the Court is Plaintiff's undisputed evidence regarding alleged violations of the ADA, whether proposed solutions are "readily achievable," and what the costs might be to remedy such violations.

Accordingly, the Court will consider Bluhm's factually supported deposition and declaration as expert testimony that "embraces" an ultimate issue as permitted by Rule 704(a), but will evaluate Anderson's deposition testimony as his opinion but not as expert testimony.

**B.      The Americans with Disabilities Act**

**1.      Purpose And *Prima Facie* Case of Discrimination Under Title III**

Congress passed the ADA, 42 U.S.C. § 12101 *et seq.*, in 1990 "to provide clear, strong, consistent, enforceable standards addressing discrimination against individuals with disabilities." *Id*. § 12101(b)(2).  The ADA is a remedial statute, which should be broadly construed to effectuate its purpose of eliminating discrimination against the disabled in our society.  *Parr*, 96 F. Supp. 2d at 1081; *Cohen v. City of Culver City*, 754 F.3d 690, 695 (9th Cir. 2014) ("We construe the language of the ADA broadly to advance its remedial purpose.").  As the Ninth Circuit has stated:

> The concept of "discrimination" under the ADA does not extend only to obviously exclusionary conduct—such as a sign stating that persons with disabilities are unwelcome or an obstacle course leading to a store's entrance.  Rather, the ADA proscribes more subtle forms of discrimination—such as difficult-to-navigate restrooms and hard-to-open doors—that interfere with disabled individuals' "full and equal enjoyment" of places of public accommodation.

United States District Court
Northern District of California

1   *Chapman*, 631 F.3d at 945 (citations omitted).

2         Title III of the ADA, 42 U.S.C. § 12181 *et seq*., at issue in this case, prohibits

3   discrimination in public accommodations, providing: "No individual shall be discriminated against

4   on the basis of disability in the full and equal enjoyment of the goods, services, facilities,

5   privileges, advantages, or accommodations of any place of public accommodation by any person

6   who owns, leases (or leases to), or operates a place of public accommodation." *Id.* § 12182(a).  In

7   simpler terms, owners of "places of public accommodation" have a duty to make sure that

8   individuals with disabilities can fully enjoy the facilities. *Lopez*, 974 F.3d at 1033.  "The statute

9   provides a 'comprehensive,' 'broad mandate' to eliminate discrimination against disabled persons,

10   addressing both 'outright intentional exclusion' as well as the 'failure to make modifications to

11   existing facilities and practices.'" *Fortyune v. City of Lomita*, 766 F.3d 1098, 1101 (9th Cir. 2014)

12   (citation omitted).  The regulations implementing the ADA provide that "[a] public

13   accommodation shall remove architectural barriers *in existing facilities* . . . where such removal is

14   readily achievable, *i.e.*, easily accomplishable and able to be carried out without much difficulty or

15   expense."  28 C.F.R. § 36.304(a) (emphasis added); *see also Chapman*, 631 F.3d at 945 ("In the

16   context of existing facilities, discrimination includes 'a failure to remove architectural barriers . . .

17   where such removal is readily achievable.'" (citing 42 U.S.C. § 12182(b)(2)(A)(iv)).

18         To prevail on a discrimination claim under Title III, Plaintiff must set forth a *prima facie*

19   case showing that: (1) he is disabled within the meaning of the ADA, (2) Defendants are private

20   entities that own, lease (or lease to), or operate a place of public accommodation and (3) Plaintiff

21   was denied public accommodations by Defendants because of his disability. *Arizona ex rel.*

22   *Goddard v. Harkins Amusement Enterprises, Inc*., 603 F.3d 666, 670 (9th Cir. 2010).

23         Because Plaintiff alleges discrimination due to the presence of architectural barriers in an

24   existing facility, he must further demonstrate that: (1) the Store presents a barrier prohibited under

25   the ADA (like the third factor above), and (2) removal of the barrier is "readily achievable" or, if

26   not readily achievable, that Defendants could have provided goods and services to Plaintiff

27   through alternative methods without much difficulty or expense. *See, e.g., Lopez*, 974 F.3d at

28   1034 (citing 42 U.S.C. §§ 12182(b)(2)(A)(iv)–(v)).  In the ADA context, "readily achievable"

United States District Court
Northern District of California

24

United States District Court
Northern District of California

means "easily accomplishable and able to be carried out without much difficulty or expense." *See* 42 U.S.C. § 12181(9); 28 C.F.R. § 36.104.

Here, the first two elements of Plaintiff's Title III discrimination claim are met because neither party disputes (1) that Plaintiff is disabled pursuant to the ADA due to his substantial limitation in the ability to walk (*see* 42 U.S.C. § 12102(1)(A), (2)(A); Defendants CSF Response No. 1 (undisputed that "Plaintiff requires a wheelchair for mobility")) or (2) that the Store is a place of public accommodation within the meaning of the ADA. *See* 42 U.S.C. § 12181(7)(E); 28 C.F.R. § 36.104; Defendants CSF Response No. 2 (undisputed that "Roberts Market is a grocery store open to the public"). The issues to be decided, then, are whether the Store presents an architectural barrier prohibited under the ADA, in other words, whether Plaintiff was denied public accommodations by Defendants on account of his disability and whether removal of the barrier is "readily achievable" or, if not, whether alternative methods are readily achievable. While the ADA itself does not define architectural barriers, the ADA Title III Technical Assistance Manual defines them as "physical elements of a facility that impede access by people with disabilities." *See* Title III Technical Assistance Manual § III-4.4000 ("Manual").[8]

In *Lopez*, the Ninth Circuit provided numerous "examples of architectural barriers that are subject to the ADA," including:

> slopes and cross-slopes in a parking lot that are too steep (more than two % incline), *Kohler v. Bed Bath & Beyond of Cal., LLC*, 780 F.3d 1260, 1262 (9th Cir. 2015); aisles in a store that are not wide enough for wheelchairs, *Chapman v. Pier 1 Imps. (U.S.), Inc. ("Chapman II")*, 779 F.3d 1001, 1005 (9th Cir. 2015); seating in a restaurant that does not accommodate wheelchairs, *Strong v. Valdez Fine Foods*, 724 F.3d 1042, 1044 (9th Cir. 2013); soap dispensers and hand dryers that are mounted too high (more than forty inches from the floor), *Oliver v. Ralphs Grocery Co.*, 654 F.3d 903, 905 n.5 (9th Cir. 2011); and a bar that is too high to drink from, *Jankey v. Poop Deck*, 537 F.3d 1122, 1123 (9th Cir. 2008).

*Lopez*, 974 F.3d at 1034.

---

[8] "The [DOJ]'s interpretation of its own regulations, such as the Technical Assistance Manual, must also be given substantial deference and will be disregarded only if plainly erroneous or inconsistent with the regulation." *Kohler v. Bed Bath & Beyond of Cal., LLC*, 780 F.3d 1260, 1266 (9th Cir. 2015) (citation and quotation marks omitted).

United States District Court
Northern District of California

2.       **Burden Of Proof In A Claim For Removal Of An Architectural Barrier Under the ADA**

The Ninth Circuit has adopted a burden-shifting framework whereby plaintiffs have the initial burden at summary judgment of plausibly showing that the removal of an architectural barrier is "readily achievable." *Lopez*, 974 F.3d at 1040.  The ADA defines the phrase "readily achievable" as "easily accomplishable and able to be carried out without much difficulty or expense."  42 U.S.C. § 12181(9); 28 C.F.R. § 36.104.  To meet this burden, plaintiffs need only "articulate a plausible proposal for barrier removal, the costs of which, facially, do not clearly exceed its benefits."  *Lopez,* 974 F.3d at 1038 (adopting Second Circuit standard, citation omitted). If plaintiffs satisfy this burden, they have made out a *prima facie* case of discrimination, after which the burden shifts to defendants, who must present sufficient evidence to rebut such a showing and who bear "the ultimate burden of persuasion that barrier removal is not readily achievable.  *See id*. at 1040.

Pursuant to the ADA, determining whether an action is "readily achievable" involves consideration of four factors:

> (A) the nature and cost of the action needed; (B) the overall financial resources of the facility or facilities involved in the action; the number of persons employed at such facility; the effect on expenses and resources, or the impact otherwise of such action upon the operation of the facility; (C) the overall financial resources of the covered entity; the overall size of the business of a covered entity with respect to the number of its employees; the number, type, and location of its facilities; and (D) the type of operation or operations of the covered entity, including the composition, structure, and functions of the workforce of such entity; the geographic separateness, administrative or fiscal relationship of the facility or facilities in question to the covered entity.

42 U.S.C. § 12181(9)(A)-(D).

The Ninth Circuit has made it clear, however, that plaintiffs are not required to address in detail each of these factors to meet their initial burden: "Neither the estimates nor the proposal are required to be exact or detailed, for the defendant may counter the plaintiff's showing by meeting its own burden of persuasion and establishing that the costs of a plaintiff's proposal would in fact

1  exceed the benefits." *Lopez*, 974 F.3d at 1038 (citing *Roberts v. Royal Atl. Corp.*, 542 F.3d 363,

2  373 (2d Cir. 2008)).  If the plaintiff "makes a plausible showing that the requested accommodation

3  is readily achievable, the burden shifts to the defendant to counter plaintiff's initial showing, and

4  at that point the district court is required . . . to weigh each of the § 12181(9) factors to determine

5  whether removal of the architectural barrier is readily achievable or not." *Id.* at 1038-39.

6  Therefore, "it is in plaintiffs' best interest to submit as much evidence as possible pertaining to

7  each of the § 12181(9) factors in their initial barrier-removal proposal, even if it is not required to

8  satisfy their initial burden of plausibly showing how the costs of removal outweigh the benefits"

9  (*id.* at 1039) or else they "risk meeting their initial burden but failing to ultimately prevail on

10  summary judgment." *Id.*

      **3.**      **Application Of ADA Accessibility Guidelines ("ADAAG") To Architectural Barriers In Existing Facilities**

13        Congress charged the Attorney General with the issuance of specific standards for

14  compliance with Title III.  42 U.S.C. § 12186(b).  Consequently, the Department of Justice

15  ("DOJ") adopted the ADAAG as part of its ADA Title III standards, which "lay[s] out the

16  technical structural requirements of places of public accommodation." *Chapman*, 631 F.3d at 945

17  (citation and quotation marks omitted).

18        Plaintiff argues that the ADAAG applies to existing facilities such that technical

19  noncompliance with the ADAAG, without more, places an existing facility in violation of the

20  ADA.  Plaintiff is mistaken.  *See* 28 C.F.R. § 36.406(a)(1)-(3) ("New construction and alterations

21  subject to §§ 36.401 or 36.402 shall comply" with ADAAG); ADAAG[9] § 1 ("This document sets

22  guidelines for accessibility to places of public accommodation and commercial facilities by

23  individuals with disabilities.  These guidelines are to be applied *during the design, construction,*

24  *and alteration* of such buildings and facilities . . .") (emphasis added); *Independent Living*

25  *Resources v. Oregon Arena Corp.*, 982 F. Supp. 698, 714 (D. Or. 1997) ("The regulations

26

27  _____

[9] All citations to specific sections of ADAAG in this order are to the 1991 standards originally
28  published on July 26, 1991, and republished in 2016 as Appendix D to part 36 of Title 28 of the
C.F.R.

United States District Court
Northern District of California

establish a national standard for minimum levels of accessibility in all new facilities.").

Plaintiff cites the Ninth Circuit's decision in *Chapman* for support, but has misread that decision.  In *Chapman*, the Ninth Circuit observed that "[i]n the context of *existing* facilities, discrimination includes a failure to remove architectural barriers . . . where such removal is *readily achievable*."  631 F.3d at 945 (quoting 42 U.S.C. § 12182(b)(2)(A)(iv)) (emphasis added).  The court then explained that "[i]n the case of *newly constructed* facilities, compliance with the ADA's antidiscrimination mandate requires that facilities be *readily accessible* to and usable by individuals with disabilities."  *Id*. (quoting 42 U.S.C. § 12183(a)(1)) (emphasis added).  In the following paragraph, the court then turned to the ADAAG:  "Whether a facility is readily accessible is defined, in part, by the ADA Accessibility Guidelines ('ADAAG')."  *Id*.  The statement that ready accessibility is defined in part by the ADAAG is a reference back to the obligation placed on *newly constructed* facilities to be readily accessible.  Indeed, at the end of the following sentence, *Chapman* cited *Independent Living Resources* and specifically quoted the language quoted above about the regulations applying to "new facilities."  Thus, *Chapman* does not hold that the ADAAG applies to existing facilities.

Plaintiff also cites *Pascuiti v. N.Y. Yankees*, 87 F. Supp. 2d 221 (S.D.N.Y. 1999), but has misread that decision as well.  In that case the defendants argued that because the ADAAG applies only to new construction or altered portions of existing facilities, plaintiffs could not use those standards as the baseline for demonstrating the existence of architectural barriers at Yankee Stadium.  The court rejected that argument, explaining that "[t]he problem with this argument is that even though only new construction and alterations must comply with the Standards, those Standards nevertheless provide valuable guidance for determining whether an existing facility contains architectural barriers.  Thus, plaintiffs are allowed to compare facilities at the Stadium with the requirements laid out in the Standards as *part of* their effort to establish individual barriers to access."  *Id*. at 226 (emphasis added, citation omitted).  Doing so "does not alter the ADA's lesser requirements for existing facilities," the court explained, because "[i]n order to establish that the [defendants] have violated the ADA" at an existing facility "plaintiffs still must proffer evidence that removal of a given barrier is readily achievable.  It is the 'readily achievable'

28

1   requirement . . . that provides the lesser standard for existing facilities under Title III." *Id*.

2   Nonetheless, the court cautioned that "it is *not sufficient* for the plaintiffs to demonstrate that the

3   Stadium is not in compliance with the ADA accessibility guidelines [because they] only apply to

4   new construction[] and alterations." *Id*. at 226 n.7 (emphasis added).

5         The Ninth Circuit cited and quoted this discussion from *Pascuiti* in *Kirola v. City & Cty. of*

6   *San Francisco*, 860 F.3d 1164, (9th Cir. 2017), explaining that "compliance with ADAAG is

7   relevant whether the facility is existing, or newly constructed or altered," *id*. at 1182 n.8, because

8   "ADAAG's standards provide guidance" on whether barriers exist. *Id*.; *see also Greer v.*

9   *Richardson Independent School Dist*., 472 F. App'x 287, 292 n.3 (5th Cir. 2012) ("While there is

10   little precedent in this circuit regarding the application of the ADAAG to existing facilities, we

11   note that courts in various other circuits have refused to strictly apply ADAAG requirements to

12   existing facilities but instead rely on the ADAAG for guidance.").

13         Thus, the ADAAG requirements do not literally apply to existing facilities.  Instead, they

14   are relevant to existing facilities because they provide guidance.  However, a technical violation of

15   the ADAAG standards, without more, is not sufficient to show an ADA violation for an existing

16   facility.  If a technical violation of the ADAAG, without more, were sufficient to prove that an

17   existing facility violates the ADA, that would be tantamount to applying the ADAAG standards to

18   existing facilities in a literal fashion and not just using them for guidance.

19   **C.**  **Alterations Under the ADA And The Store's 1995 Remodel**

20         Although Plaintiff concedes, for the purpose of this motion, that the Store is an "existing

21   facility," he also argues that the upgrades to the Store undertaken in 1995 constitute an "alteration"

22   under the ADA and therefore subject that portion of the Store to a higher standard of accessibility.

23         The ADA provides that if, after January 26, 1993, any portion of an existing facility is

24   "altered . . . in a manner that affects or could affect the *usability* of the facility or part thereof," the

25   alterations must be made "in such a manner that, to the maximum extent feasible, the altered

26   portions of the facility are *readily accessible* to and usable by individuals with disabilities."  42

27   U.S.C. § 12183(a)(2) (emphasis added); *see also* 28 C.F.R. § 36.402(b); *Chapman*, 631 F.3d at

28   945 ("Whether a facility is 'readily accessible' is defined, in part, by the ADA Accessibility

Guidelines") (citing 28 C.F.R. § 36.406(a)).

Although neither the ADA nor the Department of Justice's implementing regulations define "usability," the regulations provide the following illustrations as to what may or may not amount to an alteration:

> Alterations include, but are not limited to, remodeling, renovation, rehabilitation, reconstruction, . . . changes or rearrangement in structural parts or elements. . . . .  Normal maintenance, reroofing, painting or wallpapering, asbestos removal, or changes to mechanical and electrical systems are not alterations unless they affect the usability of the building or facility.

28 C.F.R. § 36.402(b)(1).  The Department of Justice has commented that it "remains convinced that the [ADA] requires the concept of 'usability' to be read broadly to include any change that affects the usability of the facility, not simply changes that relate directly to access by individuals with disabilities." *D'Lil,* 59 F. Supp. 3d 1001, 1012 (E.D. Cal. 2014) (citing 56 Fed.Reg. 35544, 35581 (July 26, 1991)).  While "few courts in the Ninth Circuit have interpreted 'usability' when assessing if an alteration has occurred," decisions outside this circuit seem "generally to exclude from 'alterations' those modifications that essentially preserve the status and condition of a facility, rather than rendering it materially 'new' in some sense." *Rodriguez v. Barrita, Inc.,* 10 F. Supp. 3d 1062, 1081 (N.D. Cal. 2014) (citing cases) (holding that restaurant's post-fire repairs did not constitute an "alteration" for purposes of the ADA because, despite that their precise extent remained unclear, repairs essentially returned stove and attendant systems to working condition and other changes appeared to be mostly superficial in nature); *see also D'Lil*, 59 F. Supp. 3d at 1012.

To determine whether a modification amounted to an alteration, a court may consider the following non-exhaustive factors:

> 1. The overall cost of the modification relative to the size (physical and financial) of the facility or relevant part thereof.
>
> 2. The scope of the modification (including what portion of the facility or relevant part thereof was modified).
>
> 3. The reason for the modification (including whether the goal is maintenance or improvement, and whether it is to change the purpose or function of the facility).

United States District Court
Northern District of California

4. Whether the modification affects only the facility's surfaces or also structural attachments and fixtures that are part of the realty.

*D'Lil*, 59 F. Supp. 3d at 1012.

It is undisputed that in 1995, Defendants made a number of changes and upgrades to the Store, including the installation of a new deli counter, meat counter, five cash registers, grocery shelving, electrical, plumbing, and gas, and automatic sliding doors.  Plaintiff argues that these changes constitute an "alteration" pursuant to the ADA, thus requiring those areas, "to the maximum extent feasible, to be readily accessible to and useable by" individuals with disabilities. *See* Mot. p. 8.  However, Plaintiff has not submitted any evidence concerning the four factors to satisfy his burden of proof that the 1995 changes rendered the Store or portions of it materially "new" in some sense rather than being mostly superficial in nature or that they did anything more than preserve the Store's status and condition.  His expert, Bluhm, for example, provided no testimony or other evidence that the 1995 modifications were substantial or altered the usability of the Store in any way.

Defendants deny that the work done in 1995 constituted a "significant remodel." Anderson Depo. at 135:9-14.  ECF No. 45-1.  Defendants submitted Anderson's testimony that he has "seen no indication that there has been a significant architectural remodel or addition, and there's been no change of use.  It's a like-kind replacement."  Anderson also stated that all the work done in 1995 falls within the work the ADA excludes as "alterations," presumably those listed in 42 U.S.C. § 36.402(b)(1).  Thus, this testimony goes to the scope of the modification and its effect on "only the facility's surfaces" rather than structural features that are "part of the realty" or that affect or could affect the usability of all or part of the Store.

In the absence of any meaningful evidence that an alteration occurred, the Court cannot find as a matter of law that the changes made to the Store in 1995 constitute an alteration under the ADA.  Accordingly, the Court rejects Plaintiff's arguments that the Store violated the ADA because the 1995 changes did not comply with the "readily accessible" standard for alterations

1    under the ADAAG.[10]

2          Defendants take the argument one step too far, however, arguing that because they are an

3    existing facility with no alterations they are not subject to accessibility requirements under the

4    ADA.  This is simply not true.  Notwithstanding the Court's finding that the 1995 remodel does

5    not constitute an "alteration," Defendants, as owners and operators of an existing facility, remain

6    under a general, ongoing obligation to remove barriers to access in the Store as an "existing

7    facility" to the extent "readily achievable" or to provide goods and services by "alternative

8    methods" if they demonstrate that barrier removal is not easily accomplishable, that is, able to be

9    carried out without much difficulty or expense.  *See* 42 U.S.C. § 12182(b)(2)(A)(iv) and (v); *see*

10   *also* 28 C.F.R. § 36.304(a).  Hence, even in the absence of an "alteration" after implementation of

11   the ADA, the "readily achievable" standards applied at the time of Plaintiff's visit to the Store.

12   **D.      Access Barriers Plaintiff Alleges He Personally Encountered At The Store**

13          **1.      Path of Travel[11] from Accessible Parking Space to Entrance**

14          To prevail on summary judgment for a discrimination claim under the ADA based on the

15   presence of architectural barriers at an existing facility, Plaintiff must first show that the Store

16   presents a barrier prohibited under the ADA and then meet his burden to show that removal of the

17   barrier is readily achievable.  If he accomplishes this, the burden shifts to Defendants to

18   demonstrate that barrier removal is not readily achievable.  If Defendants are successful, Plaintiff

19   must demonstrate that Defendants could have provided goods and services to Plaintiff through

20   alternative methods without much difficulty or expense but failed to do so.

21          Plaintiff contends that there is no accessible path of travel, as required by the ADA, to the

22   Store entrance from the designated accessible parking stall where he parked on his September 14,

23   2019 visit.  He also contends that Defendants have failed to use readily achievable solutions to fix

24

25   [10] The Court will also, therefore, ignore Plaintiff's arguments and Bluhm's testimony regarding
     whether or not modifications made in 1995 could have been made to comply with the ADA at no
26   extra expense.

27   [11] A "path of travel" includes "a continuous, unobstructed way of pedestrian passage" which
     connects a building or area of a building with "an exterior approach (including sidewalks, streets,
28   and parking areas), an entrance to the facility, and other parts of the facility."  28 C.F.R. §
     36.403(e)(1).

United States District Court
Northern District of California

the path of travel or to use alternative methods to make the Store's goods and services available to him.

### a.      The Path of Travel Is A Barrier To Access

### i.      Evidence Presented By The Parties

Defendants have an ongoing obligation to remove architectural barriers from the Store as an existing facility where doing so is readily achievable.  To show discrimination based on architectural barriers, Plaintiff must first demonstrate that the Store presents barriers that constitute physical elements impeding access by people with disabilities.

Plaintiff testified that when he arrived at the Store on September 14, 2019, he parked in the only designated accessible parking stall, located in the parking lot on the west side of the building. He testified that the pavement along the path of travel between the designated accessible parking stall and the walkway leading to the Store entrance was deteriorated, cracked, sloped, and uneven, with a large crack by the newspaper and bike rack, which made it difficult for him to make his way to the entrance.  He testified that these conditions made it difficult and uncomfortable for him to wheel over the pavement because he had to maneuver around the loose asphalt and over a particularly large crack, which was difficult and required a lot of strength, which caused discomfort in his back, arms, and fingers from gripping the wheels of his manual wheelchair.  He states that cracks are difficult for him to wheel over, in part because he has to do a "wheelie" to get over them.

The declaration of Plaintiff's expert Bluhm fully corroborates Plaintiff's testimony.  On the joint site inspection on February 27, 2020, Bluhm documented measurements of slopes and gaps and took photographs of rulers indicating measurements and level tools indicating degrees of surface slopes to verify his findings.  Bluhm states that the path of travel from the single designated accessible parking stall to the Store entrance contained slopes, which measure the rise or fall of the path in the direction of travel (*Parr*, 96 F. Supp. 2d at 1087), of up to 6.6%,[12] cross

---

[12] A one % slope rises (or falls) at the rate of one foot vertically for every one hundred feet of distance traveled.  *Parr*, 96 F. Supp. 2d at 1087.

United States District Court
Northern District of California

1    slopes, which run perpendicular to the direction of travel (*id.*), of up to 4.9%, vertical height

2    changes over one-quarter inch, and gaps in the walking surface that would allow the passage of a

3    half-inch-diameter sphere.  Photographs which Bluhm personally took and attached to his

4    declaration support these conditions and measurements.

5         Bluhm also observed and documented that the path of travel from the "perceived public

6    pedestrian walkway" parallel to the Store's parking lot to the nearest Store entrance (which

7    encompasses the path of travel from the designated accessible parking stall) contained both slopes

8    and cross slopes up to 13.6%, vertical height changes over one-quarter inch including one that was

9    approximately one full inch high, and gaps in the walking surface that would allow the passage of

10   a half-inch-diameter sphere.  He further observed that the walkway serving the Store entrances

11   contained cross slopes in excess of 2.08% in many locations, including measurements up to 3.4%.

12   Bluhm provided photographs supporting these findings as well.  Thus, Bluhm's findings support

13   Plaintiff's challenging experience navigating the path of travel.

14        Defendants have submitted no contradictory facts, but instead argue that Bluhm's

15   measurements are immaterial because they are under no obligation to remove barriers to access at

16   the Store as an existing facility and because ADAAG standards do not apply to Roberts Market.

17   Defendants cite as authoritative Anderson's deposition testimony, despite the fact that he admitted

18   he "did not do independent readings" (*see* Anderson Depo. at 90:16-94:12), did not use a level to

19   determine the slope in the path of travel from the Store's designated accessible parking spot to the

20   entrance, and took no other measurements himself.  Anderson testified that he did not disagree

21   with any of Bluhm's measurements but denied that any of Bluhm's findings constituted an access

22   barrier for the Store as an existing building.  *See id.* at 90:16-94:12.

23        Specifically, Anderson testified that the pavement between the accessible parking stall and

24   the Store entrance contained no cracks or vertical changes that would prevent access to the store

25   by a wheelchair user, nor were there any cracks or vertical changes in the pavement that a

26   wheelchair could not easily roll over, and that the "large cracks" Plaintiff alleges he encountered

27   and that were shown by Bluhm's photographs were "normal wear and tear."  *See id.*  Without the

28   benefit of a level to determine the slope, Anderson testified that he saw no "unevenness or change

in the pattern [of the surface of the path of travel] that would obstruct someone in a wheelchair from utilizing it" (*id.* at 171:9-17) and opined that the path of travel was "even enough to get in and out of the store with or without a wheelchair." *Id.* at 181:17-18.

When he was asked whether he "observe[d] any vertical changes in level or displacement . . . within the path of travel from the parking to entrance of the market," Anderson answered, "No. Nothing that would prevent access." *Id.* at 119:8-12. Anderson testified that there was an "unobstructed path of travel on [his] walking route from the parking lot to the entry doors" (*id.* at 90:16-91:4) and offered his legal conclusion that the condition of the walkway is not a barrier within the path of travel. *See id.* at 91:5-7.

Anderson's testimony that he encountered no access barrier may be accurate for himself as someone not using a wheelchair. Closer to Plaintiff's experience, however, is that of private investigator Ferris who testified about his experience visiting the Store while using a manual wheelchair. When Ferris, who is familiar with the use of a manual wheelchair, visited the Store on three occasions, he also had difficulty wheeling over the uneven pavement on the route from the designated accessible parking to the Store entrance.

Anderson discounted Bluhm's testimony, asserting that he improperly cited standards that applied to a new building and not an existing one. He likewise dismissed Bluhm's photographs as "not germane" to the Store. *Id.* at 94:10-20. Indeed, Anderson testified repeatedly that the Store has no obligation to remove any barriers because the ADA does not apply to existing structures so that barriers "can remain in the store forever." *See, e.g., id.* at 134:21-24.[13]

In a bizarre attempt to discount Plaintiff's experience and undercut his claims, Defendants dispute his testimony regarding his difficulty and discomfort navigating the path of travel by claiming that, because he successfully entered the store, he did so "without excessive strain, difficulty or injury, and did not require anyone's assistance." Opp'n. p. 7. They assert that this

---

[13] With respect to all alleged access barriers about which he was questioned, Anderson repeated that the "ADA applies to new work only" (Anderson Depo. at 127:13), not to the Store or even to the 1995 remodel because the Store is an existing facility, pre-dating the ADA. *See id.* at 145:14-23, 146:23-24, 203:17-204:7, 205:18-22, 207:17-21, 208:4-8, 209:2-212:15, 209:21-214:20.

United States District Court
Northern District of California

means that the path of travel does not constitute an access barrier.  In fact, they baldly assert that "Plaintiff did not encounter any barrier to access to the store."  *See, e.g.,* Defendants' CSF Response Nos. 33, 36.  However, the fact that Plaintiff was able to reach the entrance of the Store along pavement that has been shown to be sloping, uneven, and cracked does not mean that the path of travel is not a barrier to access.  The relevant inquiry is not whether the barrier completely precluded access, but whether it interfered with Plaintiff's "full and equal enjoyment" of the facility.  *See Chapman*, 631 F.3d at 947.  There is no genuine dispute that the path of travel from the designated accessible parking to the Store entrance contained measurable cracks and significant slopes and height changes, nor that Plaintiff experienced difficulty due to this barrier that interfered with his full and equal enjoyment of the Store.

It is clear from Plaintiff's testimony regarding his experience and Bluhm's uncontradicted measurements that the path of travel contains physical elements that impeded Plaintiff's access to the Store.  "A cross slope that is too steep can cause a wheelchair occupant to have difficult steering and, in extreme cases, cause the wheelchair to overturn."  *Parr*, 96 F. Supp. 2d at 1087. The fact that Plaintiff was able to navigate the cracked, sloping, uneven pavement and even, apparently, "doing a wheelie" over a quarter-inch crack without overturning his wheelchair does not mean that the condition of the path of travel does not violate the ADA.

### ii.      Application Of The ADAAG

Defendants argue that the state of the path of travel is immaterial because the ADAAG standards do not apply to the Store as an existing facility and they are under no obligation to remove access barriers.  However, while the ADAAG does not apply directly to existing facilities, compliance with ADAAG is relevant to existing facilities, as it provides guidance on whether barriers exist.

The ADAAG provides that "[a]t least one accessible route . . . shall be provided from . . . accessible parking . . . to the accessible building entrance they serve."  ADAAG § 4.3.2(1). Bluhm clearly documented his findings from the site inspection that the path of travel from the designated accessible parking stall to the closest Store entrance has debris, cracks, loose asphalt, and gaps and contains slopes, cross slopes, and vertical height changes exceeding those permitted

1    under the ADAAG.  ADAAG § 4.5.1 provides that surfaces along accessible routes shall be stable

2    and firm.  Bluhm's testimony and photographs clearly indicate that the path of travel is anything

3    but stable and firm and therefore inconsistent with ADAAG § 4.5.1.  Anderson admitted that

4    cracked asphalt may be a barrier but asserts that "there's no work required on this particular

5    property."  Anderson Depo. 92:1-11, 16-20.  Thus, he makes no attempt to address the

6    requirements of ADAAG but rejects out of hand the possibility that it is relevant to the Store.

7         Although ADAAG Standard 4.1.6(3)(a) permits slopes to exceed 1:12 or 8.33% in existing

8    facilities "if space limitations prohibit the use of a 1:12 slope or less,"[14] a slope steeper than 1:8

9    [or 12.5%] is not allowed."  *Parr*, 96 F. Supp. 2d at 1087 (citing ADAAG § 4.1.6(3)(a)(ii)).

10   ADAAG § 4.3.7 provides that an accessible route with a "running slope of greater than 1:20 [or

11   5%] is a ramp and shall comply with [ADAAG §] 4.8."  *Id.*  "The least possible slope shall be

12   used for any ramp."  ADAAG § 4.8.2.  Bluhm testified that the path of travel from the designated

13   accessible parking stall to the Store entrance "contained slopes up to 6.6% [or 1:15] in the

14   direction of travel."  This route does not exceed ADAAG § 4.1.6(3)(a) but, because it has a

15   running slope of greater than 1:20 [or 5%], it is considered a ramp and must therefore contain the

16   least possible slope.  Bluhm's photographs make clear that there is plenty of space available to

17   have less slope.

18        Similarly, Bluhm measured slopes of up to 13.6% in the path of travel from the perceived

19   public pedestrian walkway to the nearest Store entrance which adjoins the access aisle serving the

20   Store's designated accessible parking stall and merges with the Store's entry/exit walkway.  This

21   violates ADAAG § 4.1.6(3)(a)(ii)'s prohibition of any slope steeper than 12.5%, which also

22   supports a finding of the path of travel as a barrier.

23        ADAAG § 4.3.7 provides that no cross slope of an accessible route shall exceed 1:50 [or

24   2%].  Bluhm testified that the path of travel from the designated accessible parking stall to the

25   Store entrance contained cross slopes up to 4.9% [or 1:20], more than twice as steep as permitted

26

27

28   [14] But even this exception has its limits, as a slope between 1:10 and 1:12 [10% and 8.33%] is
     allowed for a maximum rise of 6 inches (ADAAG § 4.1.6(3)(a)(i)) and a slope between 1:8 and
     1:10 [12.5% and 10%] is allowed for a maximum rise of 3 inches.  ADAAG § 4.1.6(3)(a)(ii).

1   by ADAAG § 4.3.7.  Bluhm further observed that the walkway serving the Store entrances

2   contained cross slopes in excess of 2.08% in many locations, including measurements up to 3.4%,

3   also exceeding the slope permissible under ADAAG § 4.3.7.

4       Bluhm testified that the path of travel from the designated accessible parking stall to the

5   Store entrance contained vertical height changes over one-quarter inch, including one of

6   approximately one full inch, and that the path of travel contained gaps in the walking surface

7   permitting the passage of a half-inch-diameter sphere.  ADAAG § 4.5.2 provides that vertical

8   changes in height along accessible routes up to one-quarter inch may be vertical and without edge

9   treatment, while changes between one-quarter and one-half inch must be beveled with a slope no

10  greater than 1:2 [or 50%], and changes in level greater than one-half inch requires a ramp.  *See*

11  *also* ADAAG § 4.3.8 (with greater than one-half inch level changes, "a curb ramp, ramp, elevator,

12  or platform shall be provided").  As there is no evidence that the height change is beveled or that

13  there is a ramp across the larger gap, the path of travel does not comport with ADAAG.  These

14  facts also support a finding that the path of travel violates the ADA.

15      Anderson's testimony, including his characterization of the unevenness and cracks in the

16  path of travel as "normal wear and tear" and his assessment based on his personal experience that

17  nothing prevented him "or anyone else from traversing that path" (*id.* at 92:11-13), with no

18  evidence that he otherwise evaluated the condition of the asphalt on the path of travel or compared

19  it to any relevant standard, amounts to no more than conclusory speculation.  The farthest extreme

20  of Anderson's testimony is his unsupported opinion that even if the path of travel contained "a

21  barrier, like Half Dome, there's still no work required because there's been no new work done."

22  Anderson's deposition testimony thus does not constitute substantive contrary evidence regarding

23  the path of travel as a barrier.  Even if the Court were to credit Anderson's opinion testimony as

24  "expert," the combination of his lack of independent measurements and his agreement with Bluhm

25  means, in the end, that Defendants have provided no countervailing evidence establishing a

26  genuine dispute as to Bluhm's findings and whether or not they demonstrate departures from

27  ADAAG's standards.

28      Thus, using the ADAAG as relevant guidance to assess accessibility, in conjunction with

1   Plaintiff's testimony and Bluhm's measurements, the Court finds that the path of travel from both

2   the designated accessible parking stall and the perceived pedestrian pathway to the Store entrance,

3   as well as the walkway serving the entrance, constitute barriers to access in violation of the ADA.

4   Defendants are thus required either to remedy this barrier if it is "readily achievable" to do so or to

5   provide their goods and services by some alternative method to wheelchair-bound customers.

6           **b.    Plaintiff's Initial Burden To "Plausibly Show" That Proposed Barrier
                    Removal Is "Readily Achievable"**

7

8           Under the Ninth Circuit's burden-shifting framework in *Lopez*, Plaintiff bears the initial

9   burden of making a plausible showing that his proposal regarding barrier removal is readily

10  achievable, *i.e.,* easily accomplishable and able to be carried out without much difficulty or

11  expense.  To meet his initial burden, Plaintiff must address the four factors of 42 U.S.C. §

12  12181(9).  He need not go into great detail regarding each of the four factors, however, in order to

13  plausibly show that barrier removal is readily achievable.

14          Plaintiff provided specific evidence and estimates to demonstrate that his proposals to

15  remedy the ADA violation in the path of travel from the accessible parking stall to the Store

16  entrance do not clearly exceed its benefits.  Bluhm proposed two possible remedies.  First, he

17  proposed that by relocating the designated accessible parking to the east side of the Store, and

18  removing and replacing the walkway immediately serving the east entrance, Defendants could

19  remedy the uneven and cracked path of travel.  Bluhm also provided specific estimates of cost,

20  time, and business impact, stating that for a total cost of as little as $6,000 but no more than

21  $12,500, depending on the type of materials used, the barrier remediation could be completed

22  within two weeks without disrupting access to the north entrance of the Store.[15]  Alternatively, if

23  Defendants keep the accessible parking spot on the west side of the Store, Bluhm estimated that

24  the cost would be approximately $2,000 to overlay and compact hot asphalt between the public

25

26  _____

27  [15] This proposal was intended to remedy not just the path of travel from the accessible parking
    spot to the nearest Store entrance, but also several other alleged barriers, such as the lack of a
    second accessible parking space.  *See* ECF No. 40-1 (Fact 50).  As the Court is not ordering the
    creation of a second accessible parking spot, presumably the actual cost of implementing this
    option would be lower than Bluhm's estimate.

28

United States District Court
Northern District of California

sidewalk and the west walkway serving the Store entrance (which is the same route of travel as from the accessible parking spot because the pedestrian walkway adjoins the access aisle serving the parking stall) to create an accessible path of travel, which job could be completed in a day with minimal impact to the Store's business operations.  Bluhm Decl. ¶¶ 12, 13.  Neither of these amounts appears to be excessive to remediate the barrier posed by the path of travel, particularly in the context of a grocery store employing between fifty and one hundred employees in two locations.

Thus, Plaintiff has submitted evidence regarding the nature and cost of the action needed, the minimal impact on business operations, and a specific proposal to remedy the barrier that plausibly shows that the cost of barrier removal does not clearly exceed its benefits.  As a result, Plaintiff has met his initial burden, thereby making out a *prima facie* case of discrimination through failure to remove an architectural barrier, so the burden shifts to Defendants.

### c.    Defendants' Burden of Persuasion That Remedy Is Not Readily Achievable

Defendants must now present sufficient evidence to rebut Plaintiff's showing in order to meet their ultimate burden of persuasion that barrier removal is not readily achievable.  However, Defendants do essentially the opposite of this.  Plaintiff's separate statement of facts in support of his summary judgment motion proposed as fact No. 50 the first of Bluhm's proposed estimates of the cost of remedying the path of travel (relocating the parking stall to the east side of the Store).  Defendants' response to fact No. 50 was to state:  "Undisputed for purposes of this motion.  Investigation is continuing and Defendants reserve the right to dispute this claim at trial.  Immaterial because it does not establish that the demanded fix is readily achievable, for the reasons discussed in Defendants' Opposition."  ECF No. 45-3, fact 50.  Thus, "for purposes of this motion," there is no factual dispute concerning the expense needed to fix the path of travel.

In their opposition, Defendants claim that "the governing legal standards themselves inherently raise material factual disputes as to which alleged access barriers are 'readily achievable' to remove or fix, depending on a host of facts to determine whether the proposed fix is

'easily accomplishable and able to be carried out without much difficulty or expense'" and that "[d]etermining whether the removal of architectural barriers is readily achievable is an issue of fact . . . and should be made on a case-by-case basis in light of the factors listed in § 12181(9)." Opp'n. pp. 4-5.

Doubtless, the issue of whether removal of barriers is "readily achievable" may be an issue of fact in cases where conflicting evidence is presented to the court.  Defendants cite a single California case to support this argument.  In *D'Lil v. Stardust Vacation Club*, 2001 WL 1825832, *5 (E.D. Cal. Dec. 21, 2001), the defendant rebutted plaintiff's cost estimate of renovations to remove the access barrier by submitting its own specific cost estimate, as well as an allegation that it suffered net losses during the previous two years such that the remodeling project would cost more than its net income.  *Id.* at *5-6.  The *D'Lil* plaintiff countered that the economic analysis should vary for non-profit entities like the defendant.  In *D'Lil*, then, the court was faced both with conflicting estimates and with an argument regarding the appropriate way to analyze the economics of "readily achievable" barrier removal.  As a result, the *D'Lil* court determined that, under the circumstances of that case, the determination of whether removal of barriers was "readily achievable" was an issue of fact.  *Id.*[16]

Defendants also cite a Tenth Circuit case, *Colorado Cross Disability Coalition v. Hermanson Family Ltd. P'ship I*, 264 F.3d 999 (10th Cir. 2001),[17] to support their argument that determining whether removal of barriers is "readily achievable" is an issue of fact.  However, the court in *Colorado Cross* affirmed the grant of summary judgment where plaintiff introduced evidence regarding only speculative concepts of ramp installation rather than evidence that a specific design was readily achievable, failed to provide any precise cost estimates regarding the

---

[16] *Access Now, Inc. v. S. Fla. Stadium Corp.*, the Florida case Defendants cite, does state that whether a specific change is readily achievable "is a fact intensive inquiry that will infrequently be decided on summary judgment."  *Access Now, Inc. v. S. Fla. Stadium Corp.*, 161 F. Supp. 2d 1357, 1371 (S.D. Fla. 2001).  However, the court then went on to decide that very issue, concluding that plaintiffs had failed to introduce any evidence that the proposed change was readily achievable.

[17] In *Lopez*, the Ninth Circuit adopted a burden-shifting framework that slightly differs from the Tenth Circuit's framework in *Colorado Cross*, but did not otherwise disavow the result in the case.  *See Lopez*, 974 F.3d at 1035.

41

proposed modification, and failed to provide expert testimony that under the particular

circumstances installing a ramp would be readily achievable.  The court held that the inquiry into

whether a proposed modification is readily achievable "must be based on a case by case basis

under the particular circumstances and factors listed in the definition of readily achievable."

*Colorado Cross,* 264 F.3d at 1009.  Thus, *Colorado Cross* supports the proposition that summary

judgment may be granted where a party fails to present sufficient evidence regarding whether

removal of the architectural barrier is readily achievable.

Defendants have chosen not to meet their burden with specific facts to establish that the

costs of Plaintiff's proposal would exceed the benefits.  They offer no factual information of their

own on this subject, merely quoting various cases in which specific barrier removal measures,

none of which are requested by Plaintiff here, were found to be readily achievable or not.  They

have produced no evidence that any of the items requested by Plaintiff would be too difficult or

expensive for them to complete based on their financial resources, size of the business, impact on

business operations, or any other of the 42 U.S.C. § 12181(9) factors.

Defendants have produced no evidence to contradict Plaintiff's estimates as to the cost,

time, or scope of Plaintiff's proposed remedies, nor have they proposed any remedies of their own.

Indeed, as noted above, Defendants stipulated for purposes of this summary judgment motion to

the scope and cost of the repairs for one of Bluhm's estimates.

Accordingly, Defendants have failed to rebut Plaintiff's plausible showing that his

proposed barrier removal is "readily achievable" and have not met their burden of persuasion

under *Lopez.*

### d.    Alternative Methods

As an existing facility, Defendants must offer their goods and services through alternative

methods if they are unable to achieve ADA compliance through readily achievable barrier

removal.  *See* 42 U.S.C. §§ 12182(b)(2)(A)(v); 28 C.F.R. § 36.305(a) ("Where a public

accommodation can demonstrate that barrier removal is not readily achievable, [it] *shall not fail* to

make its goods, services, facilities, privileges, advantages, or accommodations available through

alternative methods, if those methods are readily achievable.") (emphasis added)).  Hence, even if

removing access barriers in the path of travel were determined not to be readily achievable, Plaintiff could still prevail on his Title III discrimination claim if he establishes that Defendants failed to make goods and services available to him through alternative methods without much difficulty or expense. Offering curbside service can satisfy an existing facility's "alternative method" obligations under the statute where barrier removal is not readily achievable. *See* 28 C.F.R. § 36.305(b).

Plaintiff testified that during his visit to the Store in September 2019, he did not see any employees outside the Store that could have assisted him, nor any way for him to summon them such as a buzzer or intercom, nor any signs with information about how to get service if, as a wheelchair user, he could not get into the Store. Hernandez Decl. ¶ 11. Oddly, Defendants dispute Plaintiff's testimony based on Anderson's visit three months later, during which he observed an elderly patron – not Plaintiff and not a person in a wheelchair – receiving help from a Store employee to release a cart that was stuck on a curb.[18] Anderson Depo. at 165:14-21, 192:12-18.

It is unclear why Defendants believe Anderson is qualified to testify concerning whether the Store provided curbside service during Plaintiff's visit or in general and why they believe Anderson's testimony constitutes evidence that employees are regularly available for curbside assistance, as would be required to demonstrate that the Store has an ongoing commitment to providing an "alternative method" to access the Store's goods and services. Anderson's visit occurred three months after Plaintiff's visit, so it is not relevant to whether there were Store employees available to help Plaintiff three months earlier; Anderson observed an elderly patron, not a disabled one, receiving help; the help provided was not to Plaintiff, so this testimony does

---

[18] Anderson testified that on December 19, 2019, he witnessed employees at the Store "come out, either talk over the counters or come out with notepads and help people with -- help a lady -- a quite elderly lady get her shopping cart and get inside the store, and they were available to take orders with notepads and just help in any way that they could" (*id*. 165:14-166:10; 166:18-25), though he did not see anyone in a wheelchair during that visit. *Id*. at 166:15-17. He and the deposing attorney refer to a photograph of that elderly patron that is "page 77 of your – of Exhibit 2." *See* Anderson Depo. at 192:8-18. Neither the photograph nor the unidentified document to which they refer was submitted to the Court.

not counter the lack of alternative service offered to Plaintiff; and the help received was for a one-time mishap, to release a cart stuck on a curb, not for curbside access for a patron in a wheelchair to goods (*e.g.*, retrieving food from inside the Store) or services (*e.g.*, placing an order for sandwiches) made unavailable by the lack of an accessible path of travel.  Hence, Anderson's testimony is irrelevant to Plaintiff's experience that the Store's goods and services were not made available to him by alternative means.

Plaintiff has submitted evidence that Defendants failed to provide an accessible path to the Store, that readily achievable barrier removal is possible, and that Defendants instituted no alternative methods to offer their goods and services.  In contrast, Defendants have completely failed to counter Plaintiff's evidence.

In sum, the Court finds that the path of travel constitutes a barrier to access, that Plaintiff's proposed barrier removal is "readily achievable," and that Defendants failed to provide goods and services by alternative means. Accordingly, the Court **GRANTS** Plaintiff's motion for summary judgment that Defendants have discriminated against Plaintiff under the ADA based on the path of travel from the accessible parking stall to the Store's entrance.

### 2.      The Deli Counter

Plaintiff alleges that the deli counter was too high, which prevented him from getting the staff's attention without yelling over the counter and reaching his order if it were placed on top of the counter.  Plaintiff argues that it is a violation of the ADA not to have an accessible portion of the counter, that it is readily achievable to provide such an accessible portion, and that Defendants failed to use alternative methods to provide Plaintiff with goods and services dispensed over the deli counter.

#### a.      The Height of the Deli Counter Is A Barrier To Access

##### i.      Evidence Presented By The Parties

As with the path of travel, to prevail on a discrimination claim under the ADA based on architectural barriers in the Store as an existing facility, Plaintiff must demonstrate first that the Store contains physical elements that impede access by people with disabilities.

During Plaintiff's deposition, he described the difficulty he experienced in making his

United States District Court
Northern District of California

order at the deli counter because it was taller than he was.  He testified that he did not see any Store employees to take his order nor any signs about how to get an employee's attention to make his order.  He testified that no employee came out from behind the counter to take his order and that there was no apparent way for him to get service at the deli counter, request help, or otherwise let the Store employees know he needed assistance, such as a service bell or other method for alerting deli staff to his presence.  He had to wait, and eventually shout and wave his arms to get the attention of a Store employee.  He had to raise his voice to order his sandwiches with an employee who remained behind the counter.  In addition, the ticket dispenser at the deli counter was too high for him to reach and was obstructed by merchandise.

The Court construes the language of the ADA broadly to advance its remedial purpose and not to tolerate, in this case, the literal invisibility of a person with a disability.  Plaintiff could not see over the deli counter to place his sandwich order, nor could he be seen as he waited to do so.  The deli therefore counter constitutes a physical element of the Store that impeded Plaintiff's ability to order sandwiches and therefore his access to the Store's goods and services.  Similarly, the height of the ticket dispenser and merchandise in front it placed it beyond reach range for people in wheelchairs and acted as a barrier to access.  This situation undoubtedly interfered with his "full and equal enjoyment" of the Store.

The fact that he was able eventually to place his order does not transform the height of the deli counter from an architectural barrier.  Defendants' argument that a successful sandwich order means that the deli counter is not an architectural barrier fares no better than their argument that Plaintiff's ability to reach the Store entrance means he did not encounter a barrier in the path of travel.

### ii.      Application Of The ADAAG

Defendants argue again that the height of the deli counter in the Store does not violate the ADA because ADAAG standards do not apply to it as an existing facility.  However, as already explained, compliance with ADAAG is relevant whether the facility is existing or new, and the ADAAG provides guidance on whether barriers exist and may be used as a point of comparison for accessibility.

45

1    Bluhm provided undisputed testimony and supporting photographs demonstrating that the

2    deli counter surfaces are over fifty-three inches high and have no portion thirty-six inches or

3    lower, an auxiliary counter, or other equivalent facilitation.[19]  Also, due to the configuration of the

4    counters and the merchandise displayed inside them, the height of the counters would obstruct a

5    wheelchair-seated person from being able to see and be seen by the workers behind the counter.

6    This situation violates ADAAG § 7.2, which requires that counters at which goods are distributed

7    must have at least a portion that is no higher than thirty-six inches, and ADAAG § 4.2.6, which

8    states that the maximum high side reach over an obstruction is forty-six inches.  *See* ADAAG §

9    4.2.6, Figure 6(c).

10    Bluhm also observed that the "take-a-number" ticket dispenser, in use by deli customers

11    during the February 2020 site visit, was positioned at a height of over fifty-eight inches high and

12    that the thirty-by-forty-six-inch space adjacent to the ticket dispenser was obstructed by stored

13    merchandise, requiring one to reach approximately twenty-two inches across the obstruction to

14    take a ticket.  Bluhm Decl. ¶ 34.  This situation does not meet the standards of ADAAG § 4.2.6,

15    which states that the maximum high side reach not over an obstruction is fifty-four inches, so the

16    dispenser height exceeds the maximum by four inches.  The stored merchandise obstructing the

17    space adjacent to the ticket dispenser does not meet the standards of ADAAG §§ 4.2.4 and 4.27.2,

18    which require clear floor space of at least thirty by forty-eight inches to be provided at controls,

19    dispensers, and other operable equipment.

20    Defendants also argue that the ADAAG height requirements do not apply to the deli

21    counter as a food service counter without a cash register.  However, that argument seems to be

22    based on nothing.  ADAAG § 7.2(2) provides that at "counters that may *or may not* have cash

23    registers but at which goods or services are sold or distributed" (emphasis added), either a portion

24    of the main counter at least thirty-six inches long shall be at most thirty-six inches high or there

25    shall be an auxiliary counter thirty-six-inches high or equivalent facilitation shall be provided.

26    Equivalent facilitation is defined as "the use of other designs and technologies are permitted where

27

28    [19] Menu brochures and informational handouts for customers to take are located on top of the deli
      counter.  Bluhm Decl. ¶ 37.

United States District Court
Northern District of California

the alternative designs and technologies used will provide substantially equivalent or greater access to and usability of the facility." ADAAG § 2.2. In *Antoninetti v. Chipotle Mexican Grill, Inc.,* 643 F.3d 1165 (9th Cir. 2010), the Ninth Circuit applied ADAAG § 7.2 to food preparation counters similar to the one at issue here. *Id*. at 1172. As the *Antoninetti* Court clarified, "[t]he food service areas of the two restaurants are 'counters' and the preparation of the customers' food orders is the sale and distribution of 'goods or services.' The 'goods' are the food itself, and the 'services' are the preparation of the meal the customer orders." *Id.*

Under *Antoninetti* then, the deli counter from which Plaintiff ordered sandwiches at the Store is used for preparation (services) and distribution of (goods) of food orders and its height may be compared to the requirements of ADAAG § 7.2. Using the ADAAG to discern the objective contours of the standard that architectural features must not impede disabled individuals' full and equal enjoyment of accommodations, the counter appears to act as a barrier to access because it is over fifty-three inches high without any portion thirty-six inches or lower, an auxiliary counter, or other condition providing substantially equivalent or greater access to and usability of the counter.

Using the ADAAG as guidance to assess accessibility, in conjunction with Plaintiff's testimony regarding his difficulty in placing his order due to the height of the deli counter and the inability to reach the ticket dispenser, and with Bluhm's testimony regarding his measurements, the Court finds that the deli counter constitutes a barrier to access in violation of the ADA. Therefore, Defendants are required either to remedy this barrier if it is "readily achievable" to do so or to provide their goods and services by some alternative method to disabled customers.

**b.      Plaintiff's Initial Burden That Proposed Barrier Removal Is Readily Achievable**

Plaintiff bears the initial burden of plausibly showing that his proposal to remove the counter as an architectural barrier is easily accomplishable and able to be carried out without much difficulty or expense. Plaintiff provided specific evidence and estimates to demonstrate that his proposal to remedy the ADA violation of excessive counter height does not clearly exceed its benefits, as outlined in 42 U.S.C. § 12181(9). For example, Plaintiff's expert Bluhm has testified

47

1    that, in order to most cost-effectively remove the barriers to access at the deli, an accessible

2    counter should be provided.  He estimated that the cost of this work would be approximately

3    $1,150 to $2,500.  Bluhm Decl. ¶ 40.[20]  He also estimated that the cost of lowering the ticket

4    dispenser and removing the obstructing merchandise was close to zero.  *Id*. ¶ 35.

5            Given the information Plaintiff provided as to the nature and cost of the action needed, as

6    well as other evidence before the Court that the Store has two locations employing between fifty

7    and one hundred people and the resources that implies, a price tag of $1,150 to $2,500 is unlikely

8    to significantly impact Defendants' overall financial condition and operation.

9            c.    **Defendants' Burden of Persuasion That Remedy Is Not Readily
10                 Achievable**

11          As Plaintiff has met his initial burden, Defendants must meet their ultimate burden of

12    persuasion to demonstrate by competent evidence that the remedies proposed by Plaintiff are not

13    readily achievable.  However, Defendants may not prevail simply by making conclusory

14    assertions.[21]

15          Anderson testified that "[l]owering the meat counter would be expensive and would

16    require costly structural modifications, including without limitation alterations to the electrical,

17    plumbing and drainage systems."  Anderson Depo. at 174:4-24.  He testified that "there would be

18    substantial cost involved" and "it's not something that is readily achievable."  Anderson Depo. at

19    174:4-6.  However, when pressed for specifics, Anderson's lack of knowledge became evident, as

20    he repeated statements such as, "I would have to have more information on the counter. . ." (*id*. at

21    174:10-11) and "I would still need much more information on design," *id.* at 174:22-23, ultimately

22    admitting he did not know what the cost would be.  *Id.* at 175:1-5.

23          The Court sustains Plaintiff's objection that Anderson's conclusion that lowering the

24    counter is not readily achievable is a legal opinion without factual basis, as Anderson has made no

25

26    ───────────────

27    [20] This estimate also included remedying other alleged barriers, such as the height of the espresso
     bar, which are not the subject of the current motion, so presumably the actual cost would be lower.

28    [21] Defendants do not dispute that making the ticket dispenser accessible is essentially costless.
     ECF No. 45-3 (Fact 60).

United States District Court
Northern District of California

1   independent assessment and provided no cost estimates of his own.  Roberts, testifying as a PMK,

2   fares no better.  As with the possibility to create accessible parking to address access barriers in

3   the path of travel, Roberts testified that she had no idea how much it would cost to lower a counter

4   (Roberts PMK Decl. at 43:12-19, 46:11-14), nor had she obtained any estimates or bids to lower

5   the deli service counter.  *Id.* at 44:15-17.  The end result is that Defendants are left with no non-

6   conclusory evidence to counter Plaintiff's estimate and meet their burden of persuasion, much less

7   any "specific facts" to create a genuine issue for trial.

8              **d.     Alternative Means**

9        If removal of a barrier is not readily achievable, Plaintiff must demonstrate that Defendants

10  could have provided goods and services to Plaintiff through alternative methods without much

11  difficulty or expense.

12       Defendants assert that they have in place an effective alternative to having an accessible

13  deli counter at the Store.  They dispute that Plaintiff experienced difficulty ordering at the deli

14  counter, arguing that "[t]he staff at the store is instructed to come around the counter to take orders

15  from customers in wheelchairs, and to come around the counter to bring the food to the customers,

16  and consistently follow this policy."  Opp'n. pp. 7-8.  They cite to the testimony of Anderson and

17  PMK Zuniga to support this argument.  Anderson says that he was asked multiple times when he

18  walked by the meat counter if he needed help (Anderson Depo. at 106:12-15) and that he saw

19  employees "either talk over the counters or come out with notepads and help people."  *Id.* at

20  165:14-21, 166:18-25.  At her deposition, PMK Zuniga read from the employee handbook what

21  she identified as the section regarding assisting disabled customers: "Take the time necessary to do

22  the job properly, carry out all reasonable size orders unless specifically told not to."  Zuniga Depo.

23  at 19:8-17.

24       Other than Defendants' assertions that they had a policy, their paid witness Anderson's

25  observation that he was asked if he needed help, and a single general sentence about filling orders,

26  Defendants have produced no evidence concerning the content of this policy, how it was

27  communicated to employees, such as a schedule or topics of employee trainings or a written

28  statement of this policy in the employee handbook.  This hardly speaks to a robust policy – or any

United States District Court
Northern District of California

49

policy at all – to offer proactive assistance to disabled customers.

In his declaration, private investigator Ferris described his experience of making a sandwich order at the Store while in a wheelchair.  Ferris said he "did not observe employees walking around the Store that looked like they would have been able to take [his] sandwich order." Ferris Decl. ¶ 5.  Instead, he waited near the deli counter "until the staff behind the deli counter asked 'Who's next?' at which point [he] raised [his] hand to get their attention."  *Id.*  The employees taking the order stood behind the counter.  "Only once out of three times an employee came out from behind the counter to give me my sandwich.  It happened after they called my completed order and I did not respond."  *Id.* ¶ 6.

Moreover, Defendants' protestations as to the existence of policies designed to assist disabled patrons if they request help do not establish that the barrier Plaintiff encountered in his difficulty placing an order at the deli counter does not exist.  Instead, both Plaintiff's and Ferris's evidence demonstrates that this policy was either ineffective in overcoming the architectural barrier or was honored in the breach.  *See Chapman v. Pier 1 Imports (U.S.) Inc.*, 779 F.3d 1001, 1008 (9th Cir. 2015).  As in *Chapman*, where the barrier that violated the ADA was present on Plaintiff's multiple visits, "it does not matter that there was compliance on two occasions when [defendant's] hired expert inspected the Store."  *Id.*  Anderson's testimony that he was offered help is insufficient to create a triable issue of fact as to the existence of the barrier.  *See id.*

Furthermore, there is no dispute that a lower auxiliary deli counter does not exist at the Store.  As noted above, ADAAG § 7.2(2) permits the alternative of an auxiliary 36-inch-high counter or the use of equivalent facilitation to provide substantially equivalent or greater access to and usability of the facility.  However, Defendants entirely failed to address the option to provide an auxiliary counter.  They also failed to produce evidence that they provide means for a wheel-chair-bound patron to have substantially equivalent or greater access to and usability of the facility.  *See* ADAAG § 2.2.

In any event, it is undisputed that Plaintiff himself did not experience the benefit of Defendants' alleged policy.  Plaintiff testified that, at the time of his visit to the Store, no employee came out from behind the counter to take his order.  There was no apparent way for him

50

to get service at the deli counter, request help, or otherwise let the Store employees know he needed assistance without being required to wave and yell, as Plaintiff eventually did.  Nor was there any sign at the deli counter telling Plaintiff how to get the deli staff's attention to make his order.  For these reasons, the Court concludes that Defendants failed to provide "alternate methods" to provide their goods and services.

In sum, the Court finds that the height of the deli counter and access to the ticket dispenser constitute a barrier to access and that Defendants have failed to meet their ultimate burden of persuasion that Plaintiff's barrier removal proposal is not readily achievable.  Accordingly, the Court **GRANTS** Plaintiff's motion for summary judgment that Defendants have discriminated against Plaintiff under the ADA based on the height of the deli counter and access to the ticket dispenser.[22]

### 3.    Additional Barriers Related to Plaintiff's Disability

Because Plaintiff personally encountered barriers to his full and equal access, he may seek removal of other barriers relating to his use of a wheelchair.  Plaintiff learned about many of the forty-one barriers in the Store alleged in Paragraph 11 of the FAC from his review of Bluhm's report.  Plaintiff now moves for summary judgment on 15 of them.  *See* Mot. at 11-17 (location of accessible parking spot, number of accessible parking spots, design of accessible parking spot, check-out aisles, height of the customer-use microwave, height of paper food trays, height of salad bar, design of salad bar, location of salad bar containers, height of soup counter, height of produce scale, height of bread bins, height of plastic bag dispenser, width of aisles in wine section, stocking carts in the way).[23]  Plaintiff fills the better part of seven pages of his Motion with a chart

---

[22] With respect to Plaintiff's claim that the second-floor restroom was inaccessible, the Court declines to reach the issue.  Plaintiff's summary judgment motion seeks injunctive relief and statutory damages of $4,000 under the Unruh Act.  Plaintiff's motion states: "Plaintiff acknowledges that providing a restroom on the first floor would likely not be readily achievable, and Defendants have represented that they have now closed the restroom to the public entirely. Accordingly, Plaintiff is not seeking injunctive relief relating to the restroom through this motion." Because the Court has determined that Plaintiff encountered two violations of the ADA, he is entitled to the minimum statutory damages of $4,000, regardless of the restroom claim.  Thus, whether Defendants could have provided an alternative method of access to a restroom is unrelated to any of the relief requested by this motion.

[23] The way the motion is drafted makes it sound like Plaintiff moved for summary judgment on the

United States District Court
Northern District of California

1    that identifies these 15 alleged barriers for which he seeks injunctive relief under the ADA through

2    this motion, the relevant ADAAG standard(s), and Plaintiff's proposal for readily achievable

3    barrier removal.  *See* Mot. at 11-17.

4         The same requirements for demonstrating discrimination based on architectural barriers in

5    the Store apply with respect to the alleged additional barriers as with the barriers previously

6    discussed.  However, Plaintiff resorts to extreme shorthand with respect to these additional

7    barriers.  Plaintiff must demonstrate first that the Store presents a barrier prohibited under the

8    ADA, but instead he simply names a condition at the Store a barrier and states what ADAAG

9    standard(s) he believes it violates.  Plaintiff must do more than this.  As discussed at length above,

10   a violation of the ADAAG is not a *per se* violation of the ADA in an existing facility.  With

11   respect to these additional alleged architectural barriers, Plaintiff's entire argument in his summary

12   judgment motion consists of a list of technical violations of ADAAG standards and nothing else.

13   Moreover, it is clear from the motion and the reply brief that the entire premise of this portion of

14   the motion is Plaintiff's assertion that ADAAG standards apply in a literal fashion to existing

15   facilities.  To grant this portion of the motion in the manner in which it has been briefed would

16   require ignoring the Ninth Circuit's statement that ADAAG's standards are *relevant* to existing

17   facilities because they provide *guidance* and replacing it with a holding that the full technical

18   details of ADAAG's standards are, without more, *dispositive* for existing facilities.  The Court

19   declines to do this.

20        Plaintiff's declaration (ECF No. 42) does not solve this problem.  Plaintiff's summary

21   judgment motion asserted technical noncompliance with ADAAG standards as the sole basis for

22   ADA liability for these 15 alleged barriers.  Plaintiff's reply brief did the same.  Paragraphs 24-27

23   and 31-40 of Plaintiff's declaration were cited in Plaintiff's separate statement of undisputed facts

24   solely to support the proposition that these alleged barriers related to Plaintiff's disability, ECF

25   No. 40-1 (facts 41, 43, 45, 47, 49, 52, 56, 68, 71, 75, 78, 81, 84, 87, 90, 93), meaning that he has

26   standing to challenge them under Ninth Circuit precedent.  Nothing in Plaintiff's briefing suggests

27   _____

28   three barriers he encountered (path of travel, deli counter, restroom) plus 21 he did not encounter.
     However, six of the 21 relate to the path of travel and the deli counter, which he did encounter.

United States District Court
Northern District of California

1    an argument that paragraphs 24-27 and 31-40 are being offered to supplement the technical

2    ADAAG violations in an attempt to show an ADA violation for an existing facility in the way that

3    Plaintiff's testimony is clearly being offered for that purpose to show liability for the path of travel

4    and height of the deli counter.  The Court will not invent an argument that Plaintiff did not

5    advance.  *See United States v. Sineneng-Smith*, 140 S. Ct. 1575, 1579 (2020) ("[I]n both civil and

6    criminal cases, in the first instance and on appeal . . ., we rely on the parties to frame the issues for

7    decision and assign to courts the role of neutral arbiter of matters the parties present.") (citation

8    and quotation marks omitted).

9         Accordingly, the Court **DENIES** Plaintiff's motion for summary judgment for

10   discrimination under the ADA with respect to the 15 additional alleged barriers that are the subject

11   of this motion.

12   **E.       Injunctive Relief**

13        When seeking prospective injunctive relief, a plaintiff must show a likelihood of future

14   injury.  *City of Los Angeles v. Lyons*, 461 U.S. 95, 105 (1983).  In the ADA context, a plaintiff

15   may establish injury in fact to pursue injunctive relief through evidence that the plaintiff

16   encountered an access barrier and either intends to return or is deterred from returning to the

17   facility.  *See Chapman,* 631 F.3d at 950.

18        Injunctive relief is an available remedy for violations of section 12182(b)(2)(A)(iv), and

19   such relief *shall* include "an order to alter facilities to make such facilities readily accessible to and

20   usable by individuals with disabilities . . ." 42 U.S.C. § 12188(a)(2).  In general, a facility is

21   "readily accessible to and usable by individuals with disabilities" if it meets the requirements of

22   the ADAAG, which is essentially an encyclopedia of design standards.  *Oliver v. Ralphs Grocery*

23   *Co*., 654 F.3d 903, 905 (9th Cir. 2011) (citing 28 C.F.R. § 36.406; 28 C.F.R. Pt. 36, App. A.)

24   Where appropriate, "injunctive relief shall also include requiring the provision of an auxiliary aid

25   or service, modification of a policy, or provision of alternative methods . . . " 42 U.S.C. §

26   12188(a)(2).

27        As demonstrated above, Plaintiff has shown that Defendants discriminated against him

28   under the ADA when he encountered architectural barriers to access in the path of travel and the

United States District Court
Northern District of California

53

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

United States District Court
Northern District of California

height of the deli counter at the Store, Plaintiff plausibly showed that such removal is readily achievable, Defendants failed to rebut this showing with substantive evidence and also failed to offer goods and service by alternative methods.

Plaintiff has also demonstrated both that he intends to return and is deterred from returning to the Store.  He lives a short distance from the Store, which is located near Woodside High School where his son's football games are often held.  He went to the Store when he was in high school, prior to his disability, and likes the food sold there.  He would like to return to the Store once it is made fully accessible to him.  In fact, Plaintiff attempted to visit the Store with his brother in late 2020 to buy sandwiches but, due to the difficulty he had encountered during his September 2019 visit, he decided not to go in and waited in the car while his brother went and bought the sandwiches.  Under the totality of the circumstances, the Court finds that Plaintiff has established a likelihood of future harm based on the Store's non-compliance with the ADA and his stated desire to patronize the Store in the future.

Pursuant to 42 U.S.C. § 12188(a)(2), then, the Court must order injunctive relief to make the Store readily accessible to and usable by Plaintiff and other individuals with disabilities. Accordingly, the Court **GRANTS INJUNCTIVE RELIEF** as specified below.

## F.      Statutory Damages

A violation of the ADA constitutes an automatic violation of the Unruh Civil Rights Act ("the Unruh Act").  Cal. Civ. Code § 51(f); *Arroyo v. Rosas*, 19 F.4th 1202, 1206 (9th Cir. 2021). In light of Plaintiff's success demonstrating two ADA violations, Plaintiff has established that Defendants also committed two Unruh Act violations.

In order to obtain damages under the Unruh Act, a plaintiff must additionally demonstrate that he suffered difficulty, discomfort or embarrassment as a result of his encounter with the access barrier.  *See* Cal. Civ. Code § 55.56(c) ("A violation personally encountered by a plaintiff may be sufficient to cause a denial of full and equal access if the plaintiff experienced difficulty, discomfort, or embarrassment because of the violation.").  Under the Unruh Act, a prevailing plaintiff is entitled to minimum statutory damages of four thousand dollars ($4,000) (Cal. Civ. Code § 52(a)), as well as injunctive relief.  *See id.* § 52 (c)(3).

1    The Court has found that architectural barriers in the Store constitute violations of the

2  ADA and therefore violate the Unruh Act.  Plaintiff testified about the difficulty, discomfort, and

3  embarrassment he experienced when he encountered architectural barriers to access during his

4  visit to the Store on September 14, 2019.  Accordingly, the Court **GRANTS** Plaintiff's prayer for

5  $4,000 in minimum statutory damages.

6                                           **V.    CONCLUSION**

7    Based on the analysis above, the Court hereby **GRANTS IN PART** and **DENIES IN**

8  **PART** Plaintiff's motion for summary judgment.  The Court enters partial judgment in favor of

9  Plaintiff and against Defendants as follows:

10   1)  Damages in the amount of $4,000 are awarded to Plaintiff.

11   2)  Defendants are ordered to complete the following barrier removal at Roberts Market,

12       located at 3015 Woodside Road in Woodside, California, in compliance with the 2010

13       Americans with Disabilities Act Standards for Accessible Design (defined in 28 C.F.R. §

14       36.104) within six months of the date of this Order:

15       a)  Eliminate excessive running slopes, cross slopes, and height changes along the route of

16           travel from the parking stall designated as accessible to the closest Store entrance;

17       b)  Modify a portion of the service counters at the deli to the proper height, and provide

18           menus/lists of items offered at the deli counter at a height accessible to patrons in

19           wheelchairs; and

20       c)  Reposition the self-serve ticket dispenser at the deli area to the proper height and

21           remove merchandise from in front of the dispenser to provide a thirty-by-forty-eight-

22           inch clear space for wheelchair approach.

23   The Court orders the parties to meet and confer and submit a case management statement

24  concerning the remaining issues in the case, including further ADR, by February 2, 2022.

25       **IT IS SO ORDERED.**

26  Dated: January 3, 2022

27

28                                          THOMAS S. HIXSON
                                            United States Magistrate Judge